**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number:  2009-NMSC-048

Filing Date: September 15, 2009

Docket No. 30,956

F. FERRELL DAVIS,

  Plaintiff-Petitioner and Cross-Respondent,

v.

DEVON ENERGY CORPORATION, et al.,

  Defendants-Respondents and Cross-Petitioners.

<u>Consolidated with</u>:

Docket No. 30,957

PHILLIS IDEAL and COLLINS PARTNERS, LTD.,
a Texas limited partnership,

  Plaintiffs-Petitioners and Cross-Respondents,

v.

BP AMERICA PRODUCTION COMPANY,

  Defendant-Respondent and Cross-Petitioner.

<u>Consolidated with</u>:

Docket No. 30,958

SMITH FAMILY, L.L.C., for itself
and all others similarly situated,

  Plaintiff-Petitioner and Cross-Respondent,

v.

**CONOCOPHILLIPS COMPANY, a Delaware corporation,**

**Defendant-Respondent and Cross-Petitioner.**

**ORIGINAL PROCEEDINGS ON CERTIORARI**
**James A. Hall, District Judge**

Peifer, Hanson & Mullins, P.A.
Charles R. Peifer
Robert E. Hanson
Matthew R. Hoyt
Albuquerque, NM

Eaves & Mendenhall, P.A.
John M. Eaves
Albuquerque, NM

Sutin, Thayer & Browne, P.C.
Derek V. Larson
Albuquerque, NM

Mary E. Walta, P.C.
Mary E. Walta
Santa Fe, NM

for Petitioners and Cross-Respondents

Montgomery & Andrews, P.A.
Sarah M. Singleton
Sharon T. Shaheen
Santa Fe, NM

Holland & Hart, L.L.P.
Michael H. Feldewert
Mark F. Sheridan
Michael O. Campbell
Robert J. Sutphin, Jr.
Kristina E. Martinez
Santa Fe, NM

Holland & Hart, L.L.P.
Scott S. Barker
Denver, CO

for Respondents and Cross-Petitioners

**OPINION**

**CHÁVEZ, Chief Justice.**

**{1}** In these consolidated class actions, Plaintiff royalty owners allege on behalf of themselves and those similarly situated that Defendant gas producers have improperly deducted from Plaintiffs' royalty payments the costs of making coalbed methane (CBM) gas "marketable." Plaintiffs claim that despite the differing language in the various royalty agreements, Defendants in every case have breached an implied covenant prohibiting Defendants from deducting the costs of gathering, treating, and otherwise making the CBM gas marketable once it has been produced.

**{2}** Presented with Plaintiffs' motions to certify these classes, the district court concluded that Defendants' consistent treatment of class members by uniformly deducting certain costs from their royalties was sufficient to certify each class for declaratory and injunctive relief under Rule 1-023(B)(2) NMRA. However, the district court denied certification for monetary damages under Rule 1-023(B)(3), concluding that individualized inquiries into the many and various royalty agreements, as required by *Continental Potash, Inc. v. Freeport-McMoran, Inc.,* 115 N.M. 690, 858 P.2d 66 (1993) and *Mark V, Inc. v. Mellekas*, 114 N.M. 778, 845 P.2d 1232 (1993), predominated over the common issues of law and fact. We affirm the district court's certification of these three classes under Rule 1-023(B)(2). However, we conclude that the district court's reliance on *Continental Potash* and *Mark V* as necessary to its determination of whether the implied covenant to make CBM gas marketable may be implied in each agreement was misplaced. We therefore reverse the district court's denial of class certification under Rule 1-023(B)(3) and remand to the district court.

## I.    CLASS ACTION CONTEXT

**{3}** We granted this interlocutory appeal to review the district court's certification orders under Rule 1-023(B)(2) and (B)(3).[1] These rules provide, in pertinent part:

> B.    **Class actions maintainable.** An action may be maintained as a class action if the prerequisites of Paragraph A of this rule are satisfied, and in addition:

---

[1]Defendants do not contend that the requirements of Rule 1-023(A) have not been met. Thus, we accept that they have been satisfied for the purposes of our review. *See* Rule 1-023(B) ("An action may be maintained as a class action if the prerequisites of Paragraph A of this rule are satisfied . . . .").

. . .

       (2)  the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

       (3)  the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Our class action certification rules mirror the federal rules. *See Ferrell v. Allstate Ins. Co.*, 2008-NMSC-042, ¶ 7, 144 N.M. 405, 188 P.3d 1156 (noting that "we may seek guidance from federal law applying the rule"). As the rule's text makes clear, one significant difference between (B)(2) and (B)(3) actions is that (B)(2) classes, unlike those certified under (B)(3), "have no requirement that the common questions predominate over individual questions, or that the class action be superior to other available methods for the fair and efficient adjudication of the controversy." 2 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 4:11, at 62 (4th ed. 2002). Instead, (B)(2) certification requires only that the defendant "has acted or refused to act on grounds generally applicable to the class," Rule 1-023(B)(2), such that "final relief of an injunctive nature or of a corresponding declaratory nature[] settl[es] the legality of the behavior with respect to the class as a whole[.]" Fed. R. Civ. P. 23 advisory committee note to subdivision (b)(2). The predominancy and superiority requirements "are applicable only for Rule 23(b)(3) class actions." Conte & Newberg, *supra* § 4:11 at 62.

**{4}**    For the purpose of our review, we accept as true all well-pled factual allegations from Plaintiffs' complaints. *See Armijo v. Wal-Mart Stores, Inc.*, 2007-NMCA-120, ¶ 23, 142 N.M. 557, 168 P.3d 129 (at the certification stage, "the court accept[s] Plaintiffs' factual allegations about the merits as true and decline[s] to examine evidence proffered by Defendants that dispute[s] such allegations"). Class certification is not the appropriate time to decide the merits of the case, *Ferrell*, 2008-NMSC-042, ¶ 2 n.1, because "'[i]n determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.'" *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) (quoting *Miller v. Mackey Int'l*, 452 F.2d 424, 427 (5th Cir. 1971)); *see also Ferrell*, 2008-NMSC-042, ¶ 7 (noting that our "current class action rule mirrors the federal rule upon which it is based. Thus, we may seek guidance from federal law applying the rule." (citations omitted)). These principles do not mean that the courts should "blindly accept any conclusory allegations which parrot Rule [1-0]23 [NMRA] requirements." *Armijo*, 2007-NMCA-120, ¶ 23 (internal quotation marks and citation omitted). Rather, the court should "engage in a rigorous analysis to determine whether Plaintiffs satisfied the requirements of Rule 1-023." *Id.*

4

## II. BACKGROUND

**{5}** Defendants are energy companies that either own or have owned working interests in various leases, units, and wells that produce CBM gas from the Fruitland coal formation of New Mexico's San Juan Basin. Plaintiffs seek to represent classes of hundreds of individuals and entities that own thousands of royalty interests and overriding royalty interests (collectively, "royalties") in Defendants' CBM gas production. Plaintiffs allege that the CBM gas produced from the Fruitland formation cannot be sold until it has been gathered, compressed, dehydrated, and otherwise treated to remove impurities such as carbon dioxide and water. Whether those costs may be deducted from Plaintiffs' royalties is the focus of the parties' dispute.

**{6}** Plaintiffs offer a number of theories purporting to grant them relief. Each claim, however, is founded upon the allegation that Defendants have breached the royalty agreements by deducting from their royalty payments the costs of making the CBM gas "marketable." They contend that under the implied covenant to market CBM gas, recognized by this Court in *Darr v. Eldridge*, 66 N.M. 260, 263, 346 P.2d 1041, 1044 (1959), Defendants have an implied duty to make CBM gas a "marketable product" such that the costs of gathering, compressing, dehydrating, and otherwise treating the CBM gas before it is sold in the interstate market may not be passed on to the royalty owners. This new covenant has been called the "first-marketable product rule," *see, e.g.*, *Rogers v. Westerman Farm Co.*, 29 P.3d 887, 904 (Colo. 2001) (en banc), as well as the "marketable condition rule." *See, e.g., Devon Energy Corp. v. Kempthorne*, 551 F.3d 1030, 1036-37 (D.C. Cir. 2008). Plaintiffs' requested relief includes a declaratory judgment, a permanent injunction, and money damages. Defendants deny any wrongdoing.

**{7}** The district court consolidated these three cases for the purposes of discovery and class certification. In each case, Plaintiffs moved to certify a class of royalty owners under both Rule 1-023(B)(2) and (B)(3), and Defendants opposed certification. At the heart of the parties' dispute was whether the many royalty instruments are sufficiently similar in relevant respects to merit class certification. Defendants argued that even if the marketable condition rule applies in New Mexico, each owner's contract must be independently reviewed, along with extrinsic evidence relevant to each party's intention, to determine if that covenant appears in each agreement. Therefore, Defendants contended that because the royalty language in many contracts is different, litigating these claims on a class-wide basis would be unmanageable under any provision of Rule 1-023. Plaintiffs argued that the agreements are sufficiently similar to warrant class certification because none expressly permitted the deductions of the costs necessary to make the CBM gas "marketable." Plaintiffs also argued that Defendants' uniform treatment of Plaintiffs in deducting those costs is sufficient to certify the class.

**{8}** In three similar memorandum opinions and corresponding orders, the district court found that in all three cases, there exist variations in the language of the royalty instruments that could affect whether the costs of removing the impurities could be deducted from

Plaintiffs' royalties. However, the district court also found that despite these differences in the written words of each contract, Defendants take a "standardized approach" in calculating royalty payments. The district court concluded that all Defendants deduct certain costs uniformly, regardless of the various language in each royalty agreement.[2]

**{9}** Based on this "consistent treatment" in calculating royalties, the district court concluded that Defendants had acted or refused to act on grounds generally applicable to the class, such that if Defendants were found liable, the court would be in a position to craft declaratory and injunctive relief to require them to comply with their contractual obligations. Accordingly, the district court certified the following (B)(2) class in each case:

> All present owners of royalty and overriding royalty interests, which burden [Defendants'] working interests in the units, leases, and wells which are now or have been productive of coal bed [sic] methane gas from the Fruitland coal formation underlying New Mexico lands, whether now or formerly owned or operated by [Defendants].

**{10}** While the district court certified the class under (B)(2), it denied certification under (B)(3), concluding that individualized issues predominated over common ones and that management of Plaintiffs' claims would be "extremely difficult." Unlike its conclusion that it would be in a position to grant declaratory and injunctive relief, the district court concluded that "determining whether a particular class member's contract has been breached and, if so, the appropriate damages, would involve significant individual issues." The district court reasoned that because the parties would have "the opportunity to present evidence to determine whether each contract is ambiguous, the evidentiary presentations on the variety of contract terms would overwhelm the case." Thus, the court concluded that "[w]hile common questions of law and fact do exist in [these cases], those common issues do not predominate over the individual issues in the claims for damages."

**{11}** After being denied interlocutory review in the Court of Appeals, Plaintiffs sought certiorari review in this Court of the denial of their (B)(3) class, and Defendants sought certiorari review of the certification of the (B)(2) class. We consolidated these three cases and granted Plaintiffs' and Defendants' petitions. *Davis v. Devon Energy Corp.*, 2008-NMCERT-003, 143 N.M. 682, 180 P.3d 1181; *Ideal v. BP Am. Prod. Co.*, 2008-NMCERT-003, 143 N.M. 683, 180 P.3d 1182; *Smith Family, L.L.C. v. ConocoPhillips Co.*, 2008-NMCERT-003, 143 N.M. 683, 180 P.3d 1182.

## III.    DISCUSSION

---

[2]The district court noted an exception to this conclusion: those royalty instruments that require payment on a "same as fed" basis, which do not allow the allocation of certain post-production costs to the royalty interest owner. *See* 3 Howard R. Williams et al., *Oil and Gas Law* § 645.2, at 612-612.1 (2008).

## A. STANDARD OF REVIEW

**{12}** We review the district court's decision to certify or not certify a class action for an abuse of discretion. *See Armijo*, 2007-NMCA-120, ¶ 17 ("[T]he district court has broad discretion whether or not to certify a class." (internal quotation marks and citation omitted)); *Brooks v. Norwest Corp.*, 2004-NMCA-134, ¶ 7, 136 N.M. 599, 103 P.3d 39 (declining the plaintiffs' invitation "to apply a 'less deferential standard' where the district court has denied [class] certification"). However, the district court's interpretation of Rule 1-023 is a question of law that is reviewed de novo, *Ferrell*, 2008-NMSC-042, ¶ 39, as are other questions of law. *Boradiansky v. State Farm Mut. Auto. Ins. Co.*, 2007-NMSC-015, ¶ 5, 141 N.M. 387, 156 P.3d 25.

**{13}** When making its certification decision, the district court will often make factual findings beyond the facts it accepts as true from the plaintiff's complaint. This is because the district court "must engage in a rigorous analysis of whether the Rule's requirements have actually been met[,]" *Ferrell*, 2008-NMSC-042, ¶ 8 (internal quotation marks and citation omitted), and may "probe behind the pleadings [to] forecast what kind of evidence may be required or allowed at trial." *Armijo*, 2007-NMCA-120, ¶ 22 (internal quotation marks and citation omitted). We review the district court's factual findings for substantial evidence. *See Brooks*, 2004-NMCA-134, ¶ 7 ("If the correct law has been applied to the facts, the district court's [class certification] decision must be affirmed when it is supported by substantial evidence." (citation omitted)). When there are no challenges to the district court's factual findings, we accept those findings as conclusive. *State v. Rotherham*, 1996-NMSC-048, 122 N.M. 246, 266, 923 P.2d 1131, 1151 (Minzner, J., specially concurring) (stating when reviewing the record for substantial evidence to support the district court's findings of fact, findings not challenged in the parties' briefs will be "deemed conclusive" (internal quotation marks and citation omitted)). We discern no such challenges here.

## B. WE DO NOT ADDRESS THE MARKETABLE CONDITION RULE

**{14}** The district court ruled on summary judgment in *Ideal* and *Smith* that "under the implied duty to market, the marketable condition rule applies in New Mexico." Although the district court was not presented with a similar motion for summary judgment in *Davis*, its memorandum opinion in *Davis* is essentially identical to those in *Ideal* and *Smith* in that they each assume that the marketable condition rule applies in New Mexico. For the purposes of our review, we accept this interlocutory ruling of the district court as applicable in each case, and we do not address the existence of the marketable condition rule in New Mexico or its applicability in any of these cases. *Cf. Ferrell*, 2008-NMSC-042, ¶ 2 n.1 (declining to reach the substantive mootness issue "[b]ecause the validity of class certification [was] the only issue on appeal").

**{15}** The district court left open the following questions, among others, pertaining to the scope of the marketable condition rule and its application in these cases: (1) whether, under the marketable condition rule, Defendants are obligated to pay royalties on a marketable

product and to bear the cost of placing the gas in a marketable condition; (2) whether CBM gas from the Fruitland formation is in a "marketable condition" when it emerges from the wellhead; (3) whether the costs deducted by Defendants were necessary to make the product marketable; and (4) whether those costs are actually and reasonably incurred. These issues are directly relevant to the existence and application of the marketable condition rule in New Mexico and will be the subject of the parties' continued litigation. Thus, the question of whether and under what circumstances the marketable product rule applies in New Mexico is not ripe for review at this time. *See Rio Grande Kennel Club v. City of Albuquerque*, 2008-NMCA-093, ¶ 24, 144 N.M. 636, 190 P.3d 1131 ("[T]he doctrine of ripeness is intended to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." (alteration in original, internal quotation marks and citation omitted)). Therefore, nothing in this opinion should be construed as either the recognition or disapproval of the marketable condition rule, its scope, or its applicability. We discuss only the propriety of the district court's certification orders.

## C.   CERTIFICATION OF THE CLASSES UNDER RULE 1-023(B)(2) WAS PROPER

**{16}**   Defendants first argue that the district court's (B)(2) certification was in error because the requested declaratory and injunctive relief will not be uniform for each class member. They contend that even though their accounting methodologies in deducting certain costs are uniform for each class, to determine if that methodology is improper, and, if so, what relief is appropriate, the district court must review the terms of each royalty agreement, as well as extrinsic evidence relevant to the parties' intentions. These inquiries, they assert, are "highly individualized" and may require that the district court fashion a variety of remedies, "each tailored to fit the varying circumstances of the individual Plaintiffs' royalty instruments." Thus, according to Defendants, this necessity for "individualized proof" of the terms of each agreement makes injunctive relief impossible "with respect to the class as a whole[.]" Rule 1-023(B)(2). We disagree.

**{17}**   Defendants' reliance on "individualized proof" and "highly individualized inquiries" is an improper attempt to incorporate the predominance and superiority requirements of Rule 1-023(B)(3) into the (B)(2) certification analysis. They effectively argue that because individualized inquiries might be required to determine if each royalty agreement was breached, those inquiries make class certification imprudent. However, the district court need not be satisfied that common issues predominate or that a class action is a superior method for resolving class members' claims in a (B)(2) action. Rather, the district court must only conclude that "the party opposing the class . . . acted or refused to act or failed to perform a legal duty . . . on grounds generally applicable to all class members" and that the final injunctive or declaratory relief will "settl[e] the legality of the behavior with respect to the class as a whole[.]" 2 Conte & Newberg, *supra* § 4:11 at 55, 56.

**{18}**   Here, the district court found that Defendants acted on grounds generally applicable to all class members by deducting certain costs uniformly in all royalty agreements,

8

regardless of the language of those instruments.  In Devon's case, the district court found that:

> Devon calculates royalty based on sale of the gas at the wellhead.  Devon uniformly calculates "at the well" valuation by computing a gross value based upon actual sales to third parties at the tailgate of the plant and then netting that value back to the wellhead or central delivery point by deducting costs for gathering, dehydrating and [carbon dioxide] removal incurred between the well or central delivery point and the sales point.

With respect to BP, the district court found that its "various methodologies all include deductions for one or more of the following services:  fuel, transportation, gathering, compression, dehydration, and treatment, including the removal of [carbon dioxide] from CBM."  Finally, regarding Conoco, the district court found that it pays class members "on a 'proceeds' basis (weighted average sales price less post-production costs incurred between the well and the sales point)."  These findings are not challenged by Defendants on review.

**{19}**    Given Defendants' standardized treatment of all class members in deducting certain costs, we agree with the district court that it would be in a position to declare the rights of the parties on a class-wide basis with respect to the propriety of those deductions.  For those agreements in which the marketable condition rule may be implied, a matter we address later in this opinion, the court would be in a position to adjudicate on a class-wide basis whether the costs uniformly deducted by Defendants were necessary to put the CBM gas in a marketable condition.  Thus, should Plaintiffs prevail, the district court would be in a position to grant class-wide injunctions to compel Defendants to stop deducting those costs from the royalty payments.  Therefore, Defendants' reliance on individualized inquiries is misplaced.

**{20}**    Finally, with respect to the district court's (B)(2) ruling, Defendants argue that certification was inappropriate because monetary damages predominate Plaintiffs' claims.  They rely on federal precedent for the proposition that injunctive and declaratory relief must be the predominant remedy in order to certify a class under (B)(2).  *See, e.g.*, *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 411 (5th Cir. 1998) (noting that the Fifth Circuit has "adopted the position taken by the advisory committee that monetary relief may be obtained in a (b)(2) class action so long as the predominant relief sought is injunctive or declaratory" (footnote omitted)).  Defendants argue that because Plaintiffs' claims are dominated by requests for money damages, certification of the (B)(2) class was an abuse of discretion.  Finally, they argue that the monetary relief is not a "group remedy" in that damages available to each class member depend on the "varying circumstances" of each class member's case.  We are not persuaded.

**{21}**    Although we have said that Rule 1-023(B)(3) "generally applies when class members seek monetary damages[,]" *Ferrell*, 2008-NMSC-042, ¶ 10 (citation omitted), our appellate courts have not yet considered the impact of requests for monetary relief on class

certification under Rule 1-023(B)(2). Those jurisdictions that impose a requirement that requests for money damages must not predominate the plaintiff class's claims do so in reliance on the Advisory Committee Note to Federal Rule of Civil Procedure 23(b)(2), which explains that certification under that provision "does not extend to cases in which the appropriate final relief relates *exclusively or predominantly* to money damages." Fed. R. Civ. P. 23(b)(2) advisory committee note to subdivision (b)(2) (emphasis added); *see also Allison*, 151 F.3d at 411. The primary concern appears to be that the class members' rights in (B)(3) actions to receive notice of the class action and to opt out of that litigation are not required in (B)(2) cases. *See* Rule 1-023(C)(2); *Allison*, 151 F.3d at 412-13. These rights are protected in (B)(3) cases because "[m]onetary remedies are more often related directly to the disparate merits of individual claims." *Allison*, 151 F.3d at 413. In other words, "a class seeking substantial monetary remedies will more likely consist of members with divergent interests." *Id.*

**{22}** These divergent interests, it is said, are minimal when the plaintiff class seeks declaratory and injunctive relief because "its members suffer from a common injury properly addressed by class-wide relief[.]" *Id.* Classes certified under (B)(2) are "assumed to be a homogenous and cohesive group with few conflicting interests among its members." *Id.* Thus, the rights to notice and opt out are less critical in (B)(2) cases because the need to protect the individual rights of class members is said to be less critical than in cases where individualized issues relating to money damages are at the forefront of the litigation.

**{23}** However valid the concerns are about the need to protect an individual's right to litigate his or her money damages claim, they must be considered in light of the reality that "[m]onetary damages are almost always requested when injunctive relief is sought." 2 Conte & Newberg, *supra* § 4:11 at 61. We agree that "[r]efusing to certify a Rule 23(b)(2) class action based on a request for monetary relief defeats the possibility of ever maintaining an injunctive class action." *Id.* at 61-62. What is more, disputes about which type of relief, injunctive or monetary, predominates the plaintiff class's claims are difficult to resolve because they require a court to determine which relief is more important to the plaintiff class. *See id*. § 4:14 at 93-94. We believe that rather than attempting to weigh which form of relief is the focus of the plaintiffs' case, "the court should conclude that when the Rule 23(a) prerequisites are satisfied and declaratory or injunctive relief is sought as an integral part of the relief for the class, then Rule 23(b)(2) is applicable regardless of the presence or dominance of additional prayers for damages relief for class members." *Id.* at 94. When both the injunctive and monetary relief are of roughly equal importance, and the other requirements of certification have been met, (B)(2) certification is proper. *Id.* at 93.

**{24}** Although we recognize that our holding will allow actions for money damages and injunctive relief to proceed under (B)(2), we are nevertheless mindful of the importance of the notice and opt-out requirements of (B)(3) actions. *See Allison*, 151 F.3d at 412 n.4 (recognizing due process rights to notice and opt out in class actions seeking monetary relief). Therefore, to protect the rights of absent class members, courts should engage in a practical assessment of the plaintiffs' claims and, consistent with their broad discretion to

10

manage class litigation, *see Salcido v. Farmers Ins. Exch.*, 2004-NMCA-006, ¶ 9, 134 N.M. 797, 82 P.3d 968, determine when and if notice and the right to opt out of the damages portion of the suit should be made available. *See* 2 Conte & Newberg, *supra* § 4:14 at 94-95, 103, 104-06 (listing options for class certification when both money damages and injunctive relief are sought by the plaintiff class). For example, the court could require notice and opt out in a (B)(2) case under Rule 1-023(D)(2), pursue a hybrid certification where notice and opt out are provided only after a determination of liability has been made, or certify only particular issues under Rule 1-023(C)(4)(a). *See* Thomas R. Grande, *Innovative Class Action Techniques—The Use of Rule 23(B)(2) in Consumer Class Actions*, 14 Loy. Consumer L. Rev. 251, 264-67 (2002). We do not determine whether the district court must provide notice and the right to opt out to (B)(2) class members in this case, as that issue is not before us. We simply acknowledge that district courts and litigants should be aware that certification of a (B)(2) class requesting significant money damages might present additional management issues.

**{25}** Here, the district court concluded that while Plaintiffs seek to recover damages for the class, "[t]o say that the primary relief requested is monetary damages fails to recognize the likelihood of substantial royalty payments which will occur in the future. Given the reserves of CBM gas, the requested declaratory relief and injunctive relief could be of greater import than the claim for damages." We agree. Although we cannot tell from the record what a typical class member's damages award might be if Defendants are found liable, we are nonetheless convinced that Plaintiffs are equally concerned about correcting Defendants' allegedly improper past conduct, as well as their conduct in the future. For each of these reasons, therefore, we affirm the district court's certification of all three classes under Rule 1-023(B)(2).

## D. WE REVERSE THE DISTRICT COURT'S DENIAL OF CLASS CERTIFICATION UNDER RULE 1-023(B)(3)

**{26}** In denying class certification under Rule 1-023(B)(3), the district court relied on two authorities, *Continental Potash* and *Mark V*. The court determined that under *Continental Potash*, it must examine the language from each royalty agreement to determine if its express terms addressed whether the costs of making CBM gas marketable could be deducted from the royalty calculations. It found that Defendants established that the express terms of the contracts vary: there are at least nineteen different variations in *Davis*, thirty-four variations in *Ideal*, and an undetermined number of variations in *Smith*. Thus, according to the district court, it would be "impossible to conclude that the contract analysis would be the same for the proposed class members," and therefore the individualized inquiries required under *Continental Potash* predominate over any common issues of law or fact.

**{27}** The district court also concluded that under *Mark V*

the court would be required at a minimum to receive evidence on relevant usage of trade, course of dealing and course of performance to determine

whether an ambiguity exists in the express terms of the contracts. Even for those contracts that have the same express terms, it may be necessary to receive evidence regarding the circumstances surrounding the making of the individual contracts.

In sum, the court concluded that because it must look to the express language of potentially thousands of contracts under *Continental Potash*, as well as extrinsic evidence of the parties' intentions under *Mark V*, "[m]anagement of a [(B)(3)] class action under the various claims for damages would be extremely difficult." It stated that "[w]ith the opportunity to present evidence to determine whether each contract is ambiguous, the evidentiary presentations on the variety of contract terms would overwhelm the case." We review the district court's interpretation of *Continental Potash* and *Mark V* in light of the requirements of interpreting Rule 1-023 de novo as questions of law. *See Ferrell*, 2008-NMSC-042, ¶ 39.

**{28}** Plaintiffs argue that the district court's reliance on *Continental Potash* and *Mark V* was misplaced, as those cases are inapplicable to the facts before the court in these consolidated class actions. While we acknowledge that the district court's reading of *Continental Potash* and *Mark V* was reasonable, we conclude that its reliance on these two cases was in error. We therefore reverse the district court's denial of certification under Rule 1-023(B)(3) and take this opportunity to clarify the requirements of *Continental Potash* and *Mark V* as they apply to the implication of legal duties on one or more parties to a mining contract.

**{29}** In *Continental Potash*, this Court adopted Texas law to determine whether an implied covenant exists in the context of mining law.

> [W]hen parties reduce their agreements to writing, the written instrument is presumed to embody their entire contract, and the court should not read into the instrument additional provisions unless this be necessary in order to effectuate the intention of the parties as disclosed by the contract as a whole. An implied covenant must rest entirely on the presumed intention of the parties as gathered from the terms as actually expressed in the written instrument itself, and it must appear that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it, and therefore omitted to do so, or it must appear that it is necessary to infer such a covenant in order to effectuate the full purpose of the contract as a whole as gathered from the written instrument. It is not enough to say that an implied covenant is necessary in order to make the contract fair, or that without such a covenant it would be improvident or unwise, or that the contract would operate unjustly. It must arise from the presumed intention of the parties as gathered from the instrument as a whole.

115 N.M. at 704, 858 P.2d at 80 (internal quotation marks and citations omitted). The Court concluded that "[t]he general rule is that an implied covenant cannot co-exist with express

12

covenants that specifically cover the same subject matter." *Id.* (citation omitted).

**{30}** In addition to evaluating the express terms of an agreement to determine if they conflict with the provisions of a purported implied covenant, *Continental Potash* requires an examination of the agreement as a whole, as well as extrinsic evidence, to determine if implying those provisions would be consistent with the parties' intentions.

> When it is clear, however, from the relevant parts of the contract taken together and considered with the facts and circumstances surrounding the execution of the agreement, that the obligation in question was within the contemplation of the parties or was necessary to effect their intention, then such obligation may be implied and enforced.

*Id.* In implying a covenant, then, *Continental Potash* relies heavily on the parties' intentions, as evidenced by their written agreement.

**{31}** The district court apparently relied on our use of the term "implied covenant" to describe the duty to market in *Darr*, 66 N.M. at 263, 346 P.2d at 1044, in determining that the provisions of *Continental Potash* applied to a determination of whether the marketable condition rule may be implied as a covenant in each royalty agreement. 115 N.M. at 704, 858 P.2d at 80 (discussing when covenants may be implied in mining contracts). What *Continental Potash* failed to make clear, however, is that there are different types of "covenants" that may be implied in a given agreement, and depending on the nature of the promise to be implied, different rules of construction apply. In other words, *Continental Potash* is not applicable in all cases.

**{32}** In determining whether a covenant may be implied in a given contract, courts must first determine the legal theory supporting the implication of that promise. In implying a covenant, courts may either be effectuating the parties' intentions by interpreting the written terms of an agreement and analyzing the parties' conduct, or they may be stating that a duty imposed by law creates an obligation on one or more of the parties to the agreement. Depending on the nature of the implied promise, the court may or may not be required to interpret the parties' agreement and effectuate their intentions.

> When a court finds a promise by implication, its procedure may be nothing more than the ordinary interpretation of word symbols; it may be the interpretation of a person's acts and other conduct not including words; *it may be the judicial determination that a legal duty exists, stating the result in the language of promise without doing anything that can properly be called interpretation*; or it may be a combination of any two of these or of all three at once.

6 Arthur Linton Corbin, *Corbin on Contracts* § 561, at 1-2 (1979) (emphasis added). Thus, in implying promises in contracts, courts must be clear if the "'implication' is true

13

interpretation or is purely judicial construction." *Id.* at 4. The former requires an analysis of the parties' intentions. The latter is merely a judicial determination of the duties the law imposes on the parties.

**{33}** In this way, the basis supporting the implication of the promise or covenant determines the court's analysis. If the court is identifying an implied legal duty of a party to a contract, it may do so regardless of the parties' intentions. *See, e.g.*, *Sanders v. FedEx Ground Package Sys., Inc.*, 2008-NMSC-040, ¶ 7, 144 N.M. 449, 188 P.3d 1200 (stating that the implied covenant of good faith and fair dealing is implicit in every contract). However, if a covenant or promise does not operate to impose a duty as a matter of law, any implied obligation must arise from the parties' intentions. This latter "process of implication is treated instead as a process of interpretation, a process of logical and factual inference and not a pure construction or creation by the court." 6 Corbin, *supra* § 562, at 10. We note that:

> It would probably be advantageous if when finding a promise by "implication" the court would ask itself whether it finds the promise by actual interpretation—that is, by searching for the meaning given to the words of the contract by one or both of the parties[—]or is putting into promissory language its finding that a party to the contract ought now to act as if he had made such a promise even though nobody actually thought of it or used words that express it.

*Id.* § 561 at 4. It is this distinction that we did not make clear in *Continental Potash*.

**{34}** *Continental Potash* applies to the process of interpreting an agreement and its surrounding circumstances to effectuate the parties' intentions, not to the implication of a legal duty controlling the parties' conduct. *Continental Potash* held that the defendants did not have an implied duty to blend different grades of potash and refrain from "high-grading" the mined potash, because "express provisions in the contract according the defendants exclusive discretion and control in the mining operations left no room for the implied covenants that the trial court enforced against [them]." 115 N.M. at 703, 704-05, 858 P.2d at 79, 80-81. By looking to the express provisions of the parties' contract, this Court determined that the parties intended that the defendants would have exclusive control over certain mining operations. *Id.* at 705, 858 P.2d at 81. Thus, the Court held that these implied covenants could *not* be implied as legal duties as a matter of law. *Id.* at 705-06, 858 P.2d at 81-82. As a result, the analysis set forth in *Continental Potash* only applies to those promises that may be implied because the parties so intended them. Its analysis does not apply to covenants that impose legal duties upon contracting parties as a matter of law.

**{35}** In this way, *Continental Potash* is inapplicable to the implication of the marketable condition rule as announced by the district court in this case. The district court ruled that "*under the implied duty to market*, the marketable condition rule applies in New Mexico." (Emphasis added.) In *Darr*, this Court recognized the implied covenant "to make diligent

14

efforts to market the production in order that the lessor may realize on his royalty interest." 66 N.M. at 263, 346 P.2d at 1044 (internal quotation marks and citation omitted); *see also Libby v. De Baca*, 51 N.M. 95, 99, 179 P.2d 263, 265 (1947) (recognizing the lessee's duty to "proceed with reasonable diligence, as viewed from the standpoint of a reasonably prudent operator, having in mind his own interest as well as that of the lessor, to market the product") (citation omitted). We implied this legal duty on oil and gas producers in equity, without looking to the language of the agreements or other evidence of the parties' intentions. *Darr*, 66 N.M. at 264, 346 P.2d at 1044. Therefore, given the district court's conclusion that the duty to market, which applies in equity irrespective of the parties' intentions, incorporates the duty to put CBM gas in a marketable condition (a conclusion we do not review in this opinion), the requirements of *Continental Potash* are likewise inapplicable to a determination of whether the marketable condition rule may be implied in each royalty agreement.

**{36}** For the same reasons that *Continental Potash* is inapplicable to this case, the extrinsic evidence analysis required by *Mark V* is also unnecessary. In *Mark V* we "discuss[ed] the appropriate methods for a trial court to use in determining whether a contract contains ambiguous terms and in resolving any ambiguities thus discovered." 114 N.M. at 779, 845 P.2d at 1233. As we have just explained, given the district court's summary judgment ruling, the provisions of each royalty agreement are irrelevant to the implication of the marketable condition rule in each contract because the district court is imposing a legal duty on Defendants. This is a matter of "purely judicial construction." 6 Corbin, *supra* § 561, at 4. Thus, the determination and resolution of any ambiguities in the contract's terms are likewise unnecessary.

**{37}** In denying class certification under Rule 1-023(B)(3), the district court relied exclusively on *Continental Potash* and *Mark V* to determine that individualized issues predominated over common ones and that the class litigation would not be a superior method for resolving Plaintiffs' claims because managing the various claims for damages would be difficult. Although we make no decision in this opinion regarding the existence or the applicability of the marketable condition rule, we believe that in light of our holding that *Continental Potash* and *Mark V* are inapplicable to these class actions, the district court's conclusion that the marketable condition rule has been incorporated in the existing duty to market is sufficient to certify these classes under Rule 1-023(B)(3). The primary issue to be litigated on remand is whether the costs deducted by Defendants were necessary to make the CBM gas "marketable." This is an issue common among all class members and is appropriate for class certification. The district court retains broad discretion in managing these class actions on remand. For example, should it see fit, it may divide the class into subclasses under Rule 1-023(C)(4)(b) or otherwise alter, amend, or decertify the class prior to a decision on the merits. Rule 1-023(C)(1).

**E.      THE DISTRICT COURT DID NOT ERR BY FAILING TO ADOPT FORMAL FINDINGS OF FACT AND CONCLUSIONS OF LAW**

15

**{38}** Plaintiffs contend that the district court's failure to enumerate specific findings of fact and conclusions of law in its certification orders was in error. They admit that "Rule 1-023 does not require that a class certification order contain findings of fact." *Salcido*, 2004-NMCA-006, ¶ 19. Instead, they contend that under *Salcido*, the district court is required to enter formal findings of fact and conclusions of law in a class certification order when requested to do so by the parties, as they did here. Plaintiffs are correct that *Salcido* did suggest that a district court must honor a party's request to enter findings of fact and conclusions of law when making a class certification decision. *See id.* ("[I]f Defendants wanted to have findings and conclusions accompanying the order, they could have submitted their own and requested they be entered."). *Salcido* relied on *DeTevis v. Aragon*, 104 N.M. 793, 800, 727 P.2d 558, 565 (Ct. App. 1986) for the proposition that "[t]he trial court must, if requested, adopt findings of fact resolving the material issues raised by the parties." *Id.* (internal quotation marks omitted). In support of that proposition, *DeTevis* relied on the predecessor to Rule 1-052 NMRA. *DeTevis*, 104 N.M. at 800, 727 P.2d at 565. Rule 1-052 charges the district court with entering findings of fact and conclusions of law in a case tried by a judge without a jury. *See* Rule 1-052(A). *Salcido* improperly equated the necessity of the court entering findings of facts and conclusions of law in non-jury trials with those "strongly encourage[d]" to be entered in class certification orders. *Rivera-Platte v. First Colony Life Ins. Co.*, 2007-NMCA-158, ¶ 45, 143 N.M. 158, 173 P.3d 765. Thus, to the extent that *Salcido* suggested that the district court must enter findings of fact and conclusions of law in a class certification order based on Rule 1-052, it is incorrect.

**{39}** The Court of Appeals has suggested in "class certification cases that district courts should provide findings of fact and conclusions of law." *Romero v. Philip Morris Inc.*, 2005-NMCA-035, ¶ 33, 137 N.M. 229, 109 P.3d 768; *see also Berry v. Fed. Kemper Life Assurance Co.*, 2004-NMCA-116, ¶ 19 n.1, 136 N.M. 454, 99 P.3d 1166 ("We take this opportunity to state a strong preference for district courts entering formal findings of fact and conclusions of law in support of their ruling in Rule 1-023 proceedings."), *abrogated on other grounds by Ferrell v. Allstate Ins. Co.*, 2007-NMCA-017, ¶ 40, 141 N.M. 72, 150 P.3d 1022, *rev'd by Ferrell*, 2008-NMSC-042. We agree that "[f]indings will make review on appeal more informed and will force the parties to explicitly address the Rule's requirements." *Berry*, 2004-NMCA-116, ¶ 19 n.1 (citation omitted). Like the Court of Appeals, we therefore strongly encourage the district court to enter findings of fact and conclusions of law in their class certification orders. However, entering findings of fact and conclusions of law is not a prerequisite to our review of the district court's certification order. The district court in Plaintiffs' cases actually made factual findings and entered conclusions of law in its memorandum opinions. Its findings and conclusions may not have been enumerated as such in a formal manner, but, as indicated throughout this opinion, they were nonetheless present.

## IV.    CONCLUSION

**{40}** For the reasons stated above, we affirm the district court's certification of the classes under Rule 1-023(B)(2). We reverse the district court's denial of certification under Rule

16

1-023(B)(3) and remand to the district court.  While our ruling requires certification of these classes under both (B)(2) and (B)(3) at this stage, the district court retains its broad discretion to manage these class actions as this litigation progresses.

**{41}   IT IS SO ORDERED.**

_____

**EDWARD L. CHÁVEZ, Chief Justice**

**WE CONCUR:**

_____

**PATRICIO M. SERNA, Justice**

_____

**PETRA JIMENEZ MAES, Justice**

_____

**RICHARD C. BOSSON, Justice**

**Topic Index for *Davis v. Devon Energy Corp.*, No. 30,956 consolidated with *Ideal v. BP America Production Co.*, No. 30,957 consolidated with *Smith Family LLC v. ConocoPhillips Co.*, No. 30,958**

| **AE** | **APPEAL AND ERROR** |
| AE-IA | Interlocutory Appeal |

| **CP** | **CIVIL PROCEDURE** |
| CP- CA | Class Actions |
| CP-FD | Findings and Conclusions |
| CP-RC | Rules, Construction of Civil Procedure |

| **CN** | **CONTRACTS** |
| CN-AM | Ambiguous Contracts |
| CN-IN | Interpretation |
| CN-IP | Implied Promises and Covenants |

| **NR** | **NATURAL RESOURCES** |
| NR-OG | Oil and Gas |
| NR-RO | Royalties |