**Certiorari Granted, March 4, 2010, No. 32,202**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2010-NMCA-026**

**Filing Date: January 11, 2010**

**Docket No.  28,605**

**WILLIAM K. SUMMERS, M.D.,**

    **Plaintiff-Appellee,**

**v.**

**ARDENT HEALTH SERVICES, L.L.C. and**
**LOVELACE HEALTH SYSTEM, INC.,**

    **Defendants-Appellants.**

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Nan G. Nash, District Judge**

Butt Thornton & Baehr PC
Emily A. Franke
Neil R. Blake
Alfred L. Green, Jr.
Albuquerque, NM

for Appellee

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Jocelyn C. Drennan
Edward Ricco
Albuquerque, NM

for Appellants

**OPINION**

**BUSTAMANTE, Judge.**

1

**{1}**      Plaintiff William K. Summers, M.D. (Dr. Summers) brought suit for damages against Defendants Ardent Health Services, L.L.C. and Lovelace Health System, Inc. (Defendants) after his medical privileges were suspended.  Relying on a specific section of the Health Care Quality Improvement Act of 1986 (HCQIA), 42 U.S.C. § 11112 (1986), Defendants requested summary judgment arguing they were immune because the professional review process leading to the suspension was reasonably conducted.  The district court denied summary judgment finding that a question existed as to the reasonableness of the efforts taken by Defendants to obtain certain facts relevant to the professional review action.  Concluding that summary judgment was properly denied, we affirm the decision of the district court.

**BACKGROUND**

**{2}**      Dr. Summers held privileges to practice psychiatric and internal medicine within the Lovelace Sandia Health System.  In 2005 Dr. Summers' medical privileges were permanently suspended based on findings of a "pattern of using inappropriate sexually explicit language with . . . patients [that] could result in imminent danger . . . whether they were seen or treated by Dr. Summers for psychiatric or internal medicine issues."  Although there were several allegations of questionable medical treatments or decisions made by Dr. Summers over the course of two investigations, his ultimate suspension was based on separate incidents involving two female patients (Patient A and Patient B).

**{3}**      The first professional review of Dr. Summers' practices was initiated in 2002 in response to a letter written by Patient A alleging improper conduct on the part of Dr. Summers.  Patient A wrote that Dr. Summers recommended she experiment with drugs and sex, and that Dr. Summers used explicit language including "the 'F' word at least [fifteen] to [twenty] times."  Dr. Summers later explained that his approach with Patient A was to try and break through her defense mechanisms by shocking her into addressing her feelings and behaviors.  A Medical Executive Committee (MEC) convened an ad hoc peer review committee to investigate this incident and ultimately ordered that Dr. Summers stop using this approach, that he begin thoroughly documenting his interaction with patients, and that his patient interactions be monitored for six months.

**{4}**      In 2003 the MEC convened a second investigation of Dr. Summers prompted by sexual comments assertedly made to another female patient, Patient B, who Dr. Summers had seen as a psychiatric consultation.  After Patient B was discharged, a case manager called to check on Patient B and became concerned.  The case manager noted that Patient B felt she was released from the hospital prematurely and was feeling suicidal.  The case manager's notes reflect that Patient B began crying during the course of their phone conversation and was afraid to return to the emergency room because she did not want to encounter Dr. Summers, who she alleged had asked her inappropriate sexual questions during the consultation. Dr. Summers' notes confirm that he took a sexual history of Patient B, but stated that Patient B had taken his questions out of context.

**{5}**     The MEC reviewed the report regarding Patient B with the understanding that Dr. Summers was expected to carefully document his decision making and to refrain from the type of therapy approach used with Patient A.  Based on these incidents and other issues related to his internal medicine practice, the MEC unanimously voted to suspend Dr. Summers' internal medicine privileges and to restrict his psychiatric privileges.  Dr. Summers exercised his rights of appeal within the Lovelace Sandia Health System administrative process by first appealing to a Professional Review Committee and finally to an Appellate Review Committee.

**{6}**     The Professional Review Committee (PRC) consisted of a panel of five physicians, none of whom was in direct economic competition with Dr. Summers. The PRC had access to the peer review records relating to the Patient A and Patient B incidents, as well as eleven other patient charts.  Four of the doctors who participated in the second investigation of Dr. Summers were called as witnesses, and each was subject to cross-examination.  Their testimony revealed that during their investigation they had not spoken to Patient B, the case manager who documented Patient B's allegations, or Dr. Summers himself.  Dr. Summers testified on his own behalf but did not call any additional witnesses.  Dr. Summers did, however, challenge the veracity of Patient B's statements as taken down by the case manager. After the hearing, the PRC recommended that the suspension of Dr. Summers' medical privileges be upheld and that his psychiatric privileges also be suspended. The PRC's decision was based primarily on the Patient A and Patient B incidents, but its original findings noted several other issues relating to Dr. Summers' internal medicine practice.

**{7}**     Dr. Summers appealed the decision of the PRC to a three-member Appellate Review Committee (ARC) comprised of chief executive officers within the Lovelace Sandia Health System.  The ARC did not consider any new facts or allegations and reviewed the findings and conclusions of the PRC only to determine whether they were supported by evidence and not otherwise arbitrary or capricious. Before reaching its final decision, the ARC referred the matter back to the PRC for additional findings of fact.  After receiving such additional findings, the ARC upheld Dr. Summers' suspension.  The ARC's findings and recommendations did not address any of the internal medicine issues addressed in the prior proceedings, and its recommendation to uphold the suspension was based primarily on "what appear[ed] to be a pattern of inappropriate use of sexually explicit language during interactions with patients."  In support of this conclusion, the ARC cited only the evidence relating to Patient A and Patient B.

**{8}**     Dr. Summers subsequently brought suit against Defendants in district court claiming defamation, breach of contract, prima facie tort, and tortious interference with prospective contracts.  Defendants moved for summary judgment asserting that the HCQIA provided a complete defense of immunity to the action.  The district court denied Defendants' motion for summary judgment finding that "[a] genuine issue of material fact exists regarding the reasonableness of the efforts taken by Defendant[s] to obtain the facts of the matter during the professional review action[]" and that "[t]his issue of fact prohibits . . . Summary Judgment on immunity grounds."

**{9}** Generally, in an ordinary lawsuit, a denial of summary judgment is not a final appealable order. *Doe v. Leach*, 1999-NMCA-117, ¶ 12, 128 N.M. 28, 988 P.2d 1252. However, our Court granted an interlocutory appeal because a defendant who is not liable because of an immunity is entitled to more than avoidance of an adverse judgment. *Id.* Such a defendant is entitled to avoid the litigation itself. *Id.*

## DISCUSSION

**{10}** "HCQIA immunity is a question of law for the court to decide and may be resolved whenever the record in a particular case becomes sufficiently developed." *Bryan v. James E. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318, 1332 (11th Cir. 1994). We apply a de novo standard of review to questions of law. *Davis v. Devon Energy Corp.*, 2009-NMSC-048, ¶ 12, 147 N.M. 157, 218 P.3d 75. The HCQIA creates a rebuttable presumption in favor of immunity, and Dr. Summers has the burden of proving by a preponderance of the evidence that Defendant's actions were outside the scope of immunity. 42 U.S.C. § 11112(a); *N. Colo. Med. Ctr. v. Nicholas*, 27 P.3d 828, 838 (2001) (en banc).

**{11}** In order to qualify for HCQIA immunity, a professional review action must have been taken:

> (1)    In the reasonable belief that the action was in the furtherance of quality health care;

> (2)    after a reasonable effort to obtain the facts of the matter;

> (3)    after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances; and

> (4)    in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain the facts and after meeting the requirement of paragraph (3).

42 U.S.C. § 11112(a). Dr. Summers argues that summary judgment was improper as to each of these elements. However, the district court limited its denial of summary judgment to the second element only. Accordingly, our review is limited to whether Dr. Summers provided sufficient evidence to permit a jury to find that he had overcome, by a preponderance of the evidence, the presumption that Defendants acted "after a reasonable effort to obtain the facts of the matter." 42 U.S.C. § 11112(a)(2); *Bryan*, 33 F.3d at 1333. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986) (stating that "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case"). The reasonableness of the fact finding efforts is measured

4

by an objective standard rather than a subjective, "good faith" standard. *Nicholas*, 27 P.3d at 838.

**{12}** Defendants argue that the district court improperly denied summary judgment because it misapprehended and misapplied the immunity standard under the HCQIA. Specifically, they argue that the district court failed to consider the totality of the process leading up to Dr. Summers' suspension, and instead focused too narrowly on the facts relating to Patient B. *See Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 637 (3rd Cir. 1996) (stating that "[t]he relevant inquiry . . . is whether the totality of the process leading up to the [b]oard's professional review action . . . evidenced a reasonable effort to obtain the facts" (internal quotation marks omitted)). Defendants also argue that, as a matter of law, it was reasonable for Defendants to rely on the case manager's notes relaying Patient B's allegations in that Dr. Summers was given a full opportunity to rebut the allegations during the administrative process. *See Rooney v. Med. Ctr. Hosp. of Chillicothe, Ohio*, No. C2-91-1100, 1994 WL 854372, at *4 (S.D. Ohio Mar. 30, 1994) (mem.) (holding that a hospital properly relied on incident reports that were "unsigned and unsworn" where the plaintiffs did not present any authority establishing that "a 'reasonable effort' to obtain facts requires sworn testimony"). Finally, Defendants argue that the district court improperly re-weighed the evidence considered by the peer reviewers. *See Bryan*, 33 F.3d at 1337 (stating that the intent of the HCQIA was to reinforce the court's traditional reluctance toward re-weighing the facts considered by peer reviewers). We are unconvinced.

**{13}** In its initial stages, the peer review action relating to Dr. Summers' internal medicine practice included several allegations other than his interaction with Patients A and B. However, the ultimate suspension of both his internal medicine and psychiatric privileges was affirmed because of the incidents involving Patients A and B. Specifically, the ARC found that Dr. Summers' psychiatry and internal medicine practices could not be reviewed in isolation of one another, "but had to be considered together." It also found that "concerns regarding Dr. Summers' internal medicine practice . . . did not, in and of themselves, rise to the level of warranting a suspension of his internal medicine privileges," but that "[t]aken in combination with his pattern in his psychiatric practice . . . he places his female patients at risk of imminent harm in his internal medicine practice as well," and that "the issues regarding Dr. Summers' interaction with his female patients create a reasonable basis to support suspension of all privileges." Thus, while the ARC's statement that the apparent "pattern of inappropriate use of sexually explicit language during interactions with patients" was a "primary basis" for its decision—implying that there were other, although not primary bases—it is clear that the suspension ultimately hinged on these two specific incidents.

**{14}** Dr. Summers admitted the allegations of Patient A, but called into question the reasonableness of the fact finding efforts relating to Patient B based on articulable concerns: that her allegation is based on notes taken by a case manager during a phone conversation, that neither the case manager nor Patient B was ever contacted or questioned regarding the incident, and that Dr. Summers vigorously disputed the allegation throughout the process. Even viewing the totality of the fact finding process, where an outcome is based

5

on only two allegations and doubt has been reasonably cast on the key fact giving rise to the disciplinary action, the total process and its result can be reasonably called into question.

{15}    Given that this case turned primarily on Patient B's disputed allegation, it is factually distinct from many of the cases relied on by Defendants finding that, as a matter of law, the totality of the fact finding efforts were reasonable. *See Brader v. Allegheny Gen. Hosp.*, 167 F.3d 832, 840-41 (3rd Cir. 1999) (where the disputed piece of evidence was only one component of an overall greater body of information justifying the action); *Bryan*, 33 F.3d at 1326 (where the doctor subject to the action had been subject to over fifty incident reports involving unprofessional or abusive treatment); *Sternberg v. Nanticoke Mem'l Hosp., Inc.*, No. CIV.A.07C-10-011 (THG), 2009 WL 3152824, at *16 (Del. Super. Ct. Sept. 18, 2009) (unpublished opinion) (where the incident leading to adverse action was so well known that it created a "shock wave" through the hospital)*, corrected and superseded by* No. CIV.A.07C-10-011 (TGH), 2009 WL 3531791 (Del. Super. Ct. Sept. 18, 2009); *Goodwich v. Sinai Hosp. of Baltimore, Inc.*, 653 A.2d 541, 546 (Md. Ct. Spec. App. 1995) (where several concerns formed the basis for the action).

{16}    Under some other set of facts, it may have been reasonable to rely as a matter of law on the case manager's handwritten notes, but here the record reflects some question, even from the investigator's perspective, as to the accuracy of Patient B's allegations. For example, during the PRC hearing, Dr. Thaler's testimony was that "*if* [Dr. Summers] said those things [to Patient B], they were not within standard practice, they [were] not appropriate language to use with a patient . . ." (emphasis added). Dr. Summers also consistently disputed Patient B's allegations. These facts raise a question as to the reasonableness of the peer reviewers' efforts to find and verify the facts supporting their action.

{17}    In coming to this conclusion, we do not re-weigh the evidence with respect to whether, if true, it is of sufficient weight to justify the suspension. We agree that such an inquiry is not within the purview of this Court under the HCQIA. *See Bryan*, 33 F.3d at 1337. Instead, our conclusion is based on the facts in the record indicating that ultimately, Dr. Summers' suspension hinged on Patient B's allegations, and that a reasonable jury, viewing these facts in the best light for Dr. Summers, could conclude by a preponderance of the evidence that Defendants were unreasonable in their fact finding efforts. *See id.* at 1333.

## CONCLUSION

{18}    For the foregoing reasons, we affirm the district court's denial of summary judgment and remand for further proceedings consistent with this opinion.

{19}    **IT IS SO ORDERED.**

_____

6

**MICHAEL D. BUSTAMANTE, Judge**

WE CONCUR:

_____

**JAMES J. WECHSLER, Judge**

_____

**JONATHAN B. SUTIN, Judge**

**Topic Index for _Summers v. Ardent Health Services LLC_, No. 28,605**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-IA | Interlocutory Appeal |
| AE-SR | Standard of Review |
| | |
| **CP** | **CIVIL PROCEDURE** |
| CP-SJ | Summary Judgment |
| | |
| **FL** | **FEDERAL LAW** |
| FL-HC | Health Care |
| | |
| **MS** | **MISCELLANEOUS STATUTES** |
| MS-HQ | Health Care Quality Improvement Act |
| MS-RO | Review Organization Immunity Act |
| | |
| **TR** | **TORTS** |
| TR-DF | Defamation |
| TR-IR | Interference with Contractual Relationship |
| TR-MM | Medical Malpractice |
| TR-PF | Prima Facie Tort |