IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number:   2014-NMSC-024

Filing Date: June 26, 2014

Docket No. 34,266

STATE OF NEW MEXICO, ex rel.,
GARY K. KING, Attorney General,

>       Plaintiff-Appellant,

v.

B&B INVESTMENT GROUP, INC.,
d/b/a CASH LOANS NOW, and
AMERICAN CASH LOANS, LLC,
d/b/a AMERICAN CASH LOANS,

>       Defendants-Appellees.

CERTIFICATION FROM THE NEW MEXICO COURT OF APPEALS

Gary K. King, Attorney General
Karen J. Meyers, Assistant Attorney General
John D. Thompson, Assistant Attorney General
Santa Fe, NM

for Appellant

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Alex C. Walker
Albuquerque, NM

for Appellees

## OPINION

**CHÁVEZ, Justice.**

{1}     In January 2006, two former payday lenders, B&B Investment Group, Inc., and American Cash Loans, LLC (Defendants), began to market and originate high-cost signature loans of $50 to $300, primarily to less-educated and financially unsophisticated individuals,

obscuring from them the details of the cost of such loans. The loans were for twelve months, payable biweekly, and carried annual percentage rates (APRs) ranging from 1,147.14 to 1,500 percent. The Attorney General's Office (the State) sued Defendants, alleging that the signature loan products were procedurally and substantively unconscionable under the common law and that they violated the Unfair Practices Act (UPA), NMSA 1978, Sections 57-12-1 to -26 (1967, as amended through 2009).

**{2}**     The district court found that Defendants' marketing and loan origination procedures were unconscionable and enjoined certain of its practices in the future, but declined to find the high-cost loans substantively unconscionable, concluding that it is the Legislature's responsibility to determine limits on interest rates. Both parties appealed. We affirm the district court's finding of procedural unconscionability. However, we reverse the district court's refusal to find that the loans were substantively unconscionable because under the UPA, courts have the responsibility to determine whether a contract results in a gross disparity between the value received by a person and the price paid. We conclude that the interest rates in this case are substantively unconscionable and violate the UPA.

**I.     BACKGROUND**

**{3}**     Defendants market, offer, and originate high-interest, small-principal loans that they call "signature loans," from retail storefronts in Albuquerque, Farmington, and Hobbs, New Mexico. Signature loans are unsecured loans which require only the signature of the borrower, along with verification of employment, home address, identity, and references. Borrowers take out loans of $50 to $300 in principal, which are scheduled for repayment in biweekly installments over a year. Signature loans carry APRs between 1,147.14 and 1,500 percent.

**{4}**     Defendants are subprime lenders from Illinois who opened several payday lending operations in New Mexico in the early 2000s because, according to company president James Bartlett, "there was no usury cap" here. Before 2006, Defendants' loan portfolios were predominantly "payday loans" which, like signature loans, are small-principal, high-interest loans. *See* Nathalie Martin, *1000% Interest—Good While Supplies Last: A Study of Payday Loan Practices and Solutions*, 52 Ariz. L. Rev. 563, 564 (2010). Payday loans differ from signature loans primarily in the length of time they take to mature: payday loan terms are between fourteen and thirty-five days, whereas Defendants' signature loans are year-long. Prior to 2007, when legislation was passed to limit payday lending, payday loans could be rolled over indefinitely, which essentially turned them into medium- to long-term loans that had the effect of keeping the borrower in debt for extended periods of time, similar to the signature loans at issue here. *See* the 2007 amendments to the New Mexico Small Loan Act of 1955 (Small Loan Act), NMSA 1978, §§ 58-15-31 to -39 (1955, as amended through 2007); *see also* Martin, *supra*, at 585-88 (discussing the similarities between signature loans and payday loans).

**{5}**     Defendants converted their loan products from payday to signature loans in Illinois

2

in 2005, after the Illinois legislature enacted its Payday Loan Reform Act. 815 Ill. Comp. Stat. 122/1-1, 1-5 (2005). Defendants also converted their loan products from payday to signature loans in New Mexico just before the New Mexico Legislature implemented extensive payday loan reforms in 2007. *See* § 58-15-32. Signature loan products are not subject to the restrictions placed on payday loans by the 2007 amendments to the Small Loan Act because they do not meet the definition of payday loans. *Compare* § 58-15-2(E) (defining installment loan) *with* § 58-15-2(H) (defining payday loan). By 2008, Defendants no longer marketed payday loans at their stores. Defendants admitted their signature loans "definitely could be a substitute product" for payday loans.

**{6}**      Defendants extend signature loans to the working poor; they lend exclusively to people who provide proof of steady employment but who, by definition, are either unbanked or underbanked. The Federal Deposit Insurance Corporation (FDIC) defines unbanked households as those without a checking or savings account, and underbanked households as those that have a checking or savings account but rely on alternative financial services. Federal Deposit Insurance Corporation, 2011 FDIC National Survey of Unbanked and Underbanked Households, Executive Summary at 3 n.2 (Sept. 2012), http://www.fdic.gov/householdsurvey/. The State's expert testified, and Defendants admit, that signature loans are "alternative financial services." All signature loan borrowers are at least underbanked, and those borrowers without a checking or savings account are unbanked. These borrowers are highly likely to live in poverty: in New Mexico, one-third of all unbanked households and almost one-quarter of all underbanked households earn less than $15,000 per year.[1] Federal Deposit Insurance Corporation, *supra*, Detailed State and MSA Tables, Appendices H-I, Table H-68, Household Banking Status by Demographic Characteristics: New Mexico at 71. Borrowers' testimony bears out the fact that Defendants target the working poor.

**{7}**      One borrower, Oscar Wellito, testified that he took out a signature loan from Defendants after he went bankrupt. He was supporting school-aged children while trying to service debt obligations with two other small loan companies. He earned about $9 an hour at a Safeway grocery store, which was not enough money to make ends meet, yet too much money to qualify for public assistance. "That's why," he testified, "I had no choice of getting these loans, to feed my kids, to live from one paycheck to another paycheck." He needed money for groceries, gas, laundry soap, and "whatever we need to survive from one payday to another payday." Mr. Wellito borrowed $100 from Defendants. His loan carried a 1,147.14 APR and required repayment in twenty-six biweekly installments of $40.16 with a final payment of $55.34. Thus, the $100 loan carried a total finance charge of $999.71.

**{8}**      Another borrower, Henrietta Charley, took out a loan from Defendants for $200 that

---

[1]In 2014, the federal poverty level for a family of four in the 48 contiguous states and the District of Columbia was $23,850. Annual Update of the HHS Poverty Guidelines, 79 Fed. Reg. 3593-01, 3593 (Jan. 22, 2014).

carried the same 1,147.14 APR as Mr. Wellito's loan. Ms. Charley, a medical assistant and mother of three, earned $10.71 per hour working thirty-two hours per week in the emergency department of the San Juan Regional Medical Center. She earned around $615 in take home pay every two weeks, while her monthly expenses, excluding food and gas, exceeded $1,000. Ms. Charley's ex-husband would only pay child support "every now and then," and when she did not receive that supplemental income, she would fall behind on her bills. She needed a loan to buy groceries and gas. Defendants gave her a $200 signature loan with a total finance charge of $2,160.04.

**{9}**     After borrowers brought complaints to the Attorney General, the State sued Defendants under the UPA, which prohibits "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce." Section 57-12-3. Unconscionable trade practices are defined in relevant part as an "extension of credit . . . that to a person's detriment: (1) takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or (2) results in a gross disparity between the value received by a person and the price paid." Section 57-12-2(E). The State identified numerous business practices that it argued were procedurally unconscionable, and alleged that the loan terms were substantively unconscionable. The State sought restitution, civil penalties, and injunctive relief. The State also sued Defendants for violating New Mexico's common law of substantive and procedural unconscionability.

**{10}**     The district court adjudicated liability in a four-day bench trial, and found that Defendants had not violated Section 57-12-2(E)(2), but that they had violated Section 57-12-2(E)(1).[2] The district court correspondingly found that the loans were not substantively unconscionable, but they were procedurally unconscionable under common law. The evidence adduced at trial is discussed below.

**{11}**     The State appealed, claiming the district court erred in three ways: first, by failing to correctly interpret and apply Section 57-12-2(E)(2), reading the substantive unconscionability prong in such a way that the section would become meaningless; second, by failing to apply the common law doctrine of substantive unconscionability to the loans; and third, by denying the State's requested restitution. Defendants cross-appealed, claiming the district court erred in determining that the loans violated Section 57-12-2(E)(1), and in determining that the loans violated the common law of procedural unconscionability. The Court of Appeals certified the case to this Court pursuant to NMSA 1978, Section 34-5-14(C)(2) (1972). We accepted certification.

## II.     STANDARD OF REVIEW

**{12}**     Because the litigation in this case involved a determination of whether a contract was

---

[2]The district court misstated Section 57-12-2(E)(1) as Section 57-12-1(E)(1) in the final paragraph of its decision.

unconscionable, we review de novo. "By both statute and case law, we review whether a contract is unconscionable as a matter of law." *Cordova v. World Fin. Corp. of N.M.*, 2009-NMSC-021, ¶ 11, 146 N.M. 256, 208 P.3d 901 (citing NMSA 1978, § 55-2-302 (1961) ("providing that courts, as a matter of law, may police against contracts or clauses found unconscionable")); *see also Fiser v. Dell Computer Corp.*, 2008-NMSC-046, ¶ 19, 144 N.M. 464, 188 P.3d 1215 (stating that unconscionability "is a matter of law and is reviewed de novo."). The district court's factual findings are reviewed for substantial evidence. *See Landavazo v. Sanchez*, 1990-NMSC-114, ¶ 7, 111 N.M. 137, 802 P.2d 1283 ("[The] court views the evidence in the light most favorable to support the findings of the trial court."). "Substantial evidence is such relevant evidence that a reasonable mind would find adequate to support a conclusion." *Id.*

## III.    DISCUSSION

### A.    There was substantial evidence to support the district court's judgment that Defendants' loans were procedurally unconscionable and violated Section 57-12-2(E)(1)

{13}    Section 57-12-2(E)(1) defines an unconscionable trade practice as any extension of credit that "takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree" and is detrimental to the borrower. Defendants challenge the sufficiency of the evidence for the district court's finding that they violated Section 57-12-2(E)(1). To support the district court's ruling, there must be substantial evidence that the borrowers lacked knowledge, ability, experience, or capacity in credit consumption; that Defendants took advantage of borrowers' deficits in those areas; and that these practices took advantage of borrowers to a grossly unfair degree to the borrowers' detriment. Section 57-12-2(E). We conclude that substantial evidence supports the district court's findings as to each of these elements.

### 1.    Evidence of borrowers' lack of financial sophistication

{14}    There was substantial evidence that the borrowers lacked knowledge, ability, experience, or capacity in credit consumption. The district court heard from Defendants that a "[s]ignature loan primarily is for someone that is an unbanked person [or] underbanked." As discussed above, all signature loan borrowers are by definition underbanked because they are utilizing alternative financial services. Ms. Charley is an example of an underbanked borrower because although she had access to a bank account, she only used it to receive child support payments. A subset of Defendants' borrowers are unbanked, like Mr. Wellito, who testified he never had a bank account because he could not afford to open one. The district court heard evidence about demographic characteristics of unbanked and underbanked New Mexicans, as well as their behavioral and cognitive biases, which were borne out by borrower testimony. We will discuss each piece of demographic and cognitive evidence in turn.

5

**{15}**    Demographically, unbanked and underbanked New Mexicans have significantly less education than the general population, are disproportionately living in poverty, and are more likely to be people of color. *See generally* Federal Deposit Insurance Corporation, National Survey of Unbanked and Underbanked Households (Dec. 2009). Their education levels are lower: the State presented evidence that in over 25 percent of unbanked and underbanked households, no one holds a high school degree, and in only a handful of unbanked households—just over 9 percent—does anyone have any college education at all. Federal Deposit Insurance Corporation, *supra*, Appendix B, Detailed State Tables, Table B-33, Banking Status by Household Characteristics: New Mexico at 102. They are more likely to be poor: 27.9 percent of unbanked households and 24.2 percent of underbanked households in New Mexico lived on less than $15,000 per year in 2009. *Id.* Over 50 percent of underbanked households live on less than $30,000 per year. *Id.* They are also more likely to belong to an ethnic minority: 41.6 percent of Hispanic households are unbanked or underbanked, and 58.3 percent of "other" households (defined as non-Hispanic, non-black, and non-white, which is a category that includes Native Americans) are unbanked or underbanked. *Id.*

**{16}**    Behaviorally and cognitively, unbanked and underbanked New Mexicans exhibit heuristic biases that work to their detriment. The State's expert, Professor Christopher Peterson,[3] testified that these borrowers exhibit certain cognitive biases that lead them to make decisions that are contrary to their interests. They exhibit unrealistic optimism, or fundamental attribution error, meaning that they overestimate their ability to control future circumstances and underestimate their exposure to risk. Thus, these borrowers have unrealistic expectations about their ability to repay these loans. They also exhibit intemporal biases, meaning they tend to focus on short-term gains, while discounting future losses they might suffer. Thus, borrowers focus on the promise of quick cash, and fail to make more considered judgments about the long-term costs of the loan. They also are subject to "framing" and "anchoring" effects, meaning that the way the price of a loan is framed at the outset may distort the prospective borrower's perception of the cost, and the borrower will retain that initial perception. If the cost initially is framed as being very low, such as $1.50 per day, a borrower will "anchor" his or her expectations on that claim and have difficulty reassessing the true costs once more information becomes available. Finally, borrowers are subject to information overload, meaning that when they are presented with a technically complex loan agreement, they cease trying to understand the terms at all because they realize they will not be able to understand all of the pricing features.

**{17}**    These cognitive biases were confirmed in a New Mexico-specific study of borrower perceptions at the point of sale in the high-cost lending environment, which Professor Peterson relied on to formulate his opinion. *See* Martin, *supra*, 52 Ariz. L. Rev. at 596-613.

_____

[3]Professor Peterson is a law professor and associate dean at the University of Utah whose area of research is consumer finance with a particular focus on high-cost, small-principal loans.

6

In that study of 109 borrowers, Professor Martin found that 75 percent of borrowers could not identify the APR of their small-principal, high-interest loan at the point of sale, or mistakenly believed that the interest rate was between one and 100 percent. *Id.* at 600-01. Additionally, borrowers could not reliably distinguish whether their loans were payday or installment loans, suggesting that the labels—as far as borrowers were concerned—are a distinction without a difference. *Id.* at 586 n.123.

**{18}** Moreover, these cognitive biases were consistent with borrower testimony. Mr. Wellito and Ms. Charley testified that they thought they would be able to pay off their loans early, which is consistent with the unrealistic optimism bias described by Professor Peterson. Evidence of intemporal bias was shown by Mr. Wellito's testimony that he took out the loan because Defendants' advertisements made it "look[] so easy," like "the money's there and . . . [y]ou just walk in and you just get it . . . [and] you pay it all off." Ms. Charley also testified that she took out the signature loan because it looked like an "easy" way out of her financial distress. The theory of framing and anchoring effects and information overload was consistent with statements from borrowers who testified that they focused on the biweekly payment amount and did not consider the long-term costs of the loan. Borrowers also testified that loan origination at Defendants' stores took about 10 minutes and was a hurried "sign here, sign there" process, which is further evidence that the borrowers may have been subject to information overload at the time of loan origination.

**{19}** Beyond cognitive biases, borrowers' simple lack of knowledge, experience, ability, or capacity in credit transactions was evident from their testimony. Mr. Wellito, who had never had a bank account in his life, could not accurately describe how interest is calculated, stating that interest is "when you borrow money . . . you pay a little bit more to have them lend you the money." He did not know that interest is quoted in terms of a percentage, and did not understand that it is better for the buyer if the number is lower. Ms. Charley had not taken out a small loan before and did not understand that her loan would require sixteen interest-only payments. Another borrower, Rose Atcitty, understood only the amount she would have to pay and the date she would have to start repayment when she took out her signature loan; she was not told about the interest rate or the finance charge, and did not understand that it was a year-long loan. This testimony shows that these were not sophisticated borrowers, but borrowers who lacked knowledge of basic consumer finance concepts and had little experience in banking and credit markets.

### 2. Evidence of Defendants' exploitation of borrowers' disadvantage

**{20}** There was substantial evidence that Defendants took advantage of borrowers' deficits. Defendants directed their employees to describe the loan cost in terms of a misleading daily rate. Employees were instructed to tell customers that interest rates are typically "between $1.00 and $1.50 per day, per one hundred you borrow." Defendants admitted that this was a factually inaccurate rate. At $1 per day, the finance charge for one year would be $365, and at $1.50 per day, the finance charge would be $547.50, but Defendants knew that the actual finance charge for one year would be at least $1,000.

7

Defendants would also advertise that they were selling loans at 50 percent off, when in fact the only thing that was 50 percent off was the interest on the first installment payment on the loan.

**{21}** Defendants aggressively pursued borrowers to get them to increase the principal of their loans. "Maximize Every Customer's Principle [sic] Balance" and "maximize every opportunity that presents itself" was the mandate. Defendants directed employees to take time every day to give every customer a "courtesy call[]" to "make them aware of the possibility of rewriting their loan if there is availability on their account." Employees were also directed to "CALL[] ACTIVE FILES TO INCREASE PRINCIPAL" with the objective of "increas[ing the] principal amount borrowed to build store." The script for the courtesy calls was as follows:

> Your account balance as of today is $_____, and your credit available is $_____. Renewing your loan with us today Mr./Mrs._____ would put an extra $____ in your pocket which I'm sure would come in handy with back to school, last minute vacations or anything else that comes up towards the end of Summer. Would you like me to get things ready for you to come in today and take care of this?

At least one store employee described a practice of calling customers who were one payment away from paying off their loans to encourage them to take out another loan.

**{22}** Defendants also instructed their employees to withhold amortization schedules from customers. The store manual instructed, "PRINT OUT THE **AMORTIZATION SCHEDULE** FOR THE FILE, BUT NEVER GIVE ONE TO A CUSTOMER!" Mr. Bartlett claimed that this entire instruction was a "misprint" in the 2007 store manual, and explained that the reason he had included it again in the 2010 version is that it was an instruction he had "overlooked when revising" the manual. He stated that although "that is exactly what [the store manual] says," Defendants actually train their employees to give out amortization schedules "to everybody." Borrowers, however, testified that they had not received amortization schedules. The district court did not credit Mr. Bartlett's testimony, finding instead that Defendants have a practice of withholding the schedules.

**{23}** Amortization schedules revealed the signature loans were interest-only loans for extended periods of time. For example, the amortization schedule in Ms. Charley's file showed that she would have to make sixteen biweekly payments of $90.68 each before any of her payments would be allocated toward her principal. According to her amortization schedule, on the seventeenth biweekly payment, she would finally pay off the first $1.56 toward her principal. Thus, Ms. Charley would have to make timely payments totaling $1,541.56 over thirty-four weeks (seventeen biweekly payments) before her loan balance would fall below the principal she borrowed. Defendants did not explain this to Ms. Charley, nor did they give her a copy of the amortization schedule.

**{24}** All of these practices were mandated by Defendants' own confidential employee manuals, demonstrating that they were systematic company policies, as opposed to isolated incidents. These practices were confirmed by the testimony of both store employees and borrowers.

### 3.    Evidence of gross unfairness and detriment

**{25}** There was substantial evidence that Defendants' practices took advantage of borrowers to a grossly unfair degree. We consider whether borrowers were taken advantage of to a grossly unfair degree by looking at practices in the aggregate, as well as the borrowers' characteristics. *Portales Nat'l Bank v. Ribble*, 2003-NMCA-093, ¶ 15, 134 N.M. 238, 75 P.3d 838. In *Ribble*, the Court of Appeals considered a bank's pattern of conduct and demographic factors of the borrowers in determining whether the bank had violated Section 57-12-2(E)(1) in foreclosing on an elderly couple's ranch:

> [T]he pattern of conduct by the Bank . . . when considered in the aggregate, constitutes unconscionable trade practices [under] Section 57-12-2(E). Though the individual acts may be legal, it is reasonable to infer that the Bank took advantage of the Ribbles to a "grossly unfair degree" because of (1) the Ribbles' advancing age, (2) their clear inability to handle their accounts, and (3) their long-term dealings with the Bank that could have justified their belief that the Bank had sufficient collateral in their property.

*Ribble*, 2003-NMCA-093, ¶ 15. Similarly, the pattern of conduct by Defendants in this case shows they were leveraging the borrowers' cognitive and behavioral weaknesses to Defendants' advantage, and that the borrowers were clearly among the most financially distressed people in New Mexico. This evidence supported a reasonable inference that Defendants were taking advantage of borrowers to a "grossly unfair degree."

**{26}** Defendants argue that the State failed to prove detriment because it "offered no evidence as to whether the individual borrower thought the loan transaction worked to his or her detriment." The UPA does not require a subjective, individualized showing of detriment. *See* § 57-12-4 (stating that the UPA is to be construed in line with Federal Trade Commission (FTC) interpretations and federal court decisions); *see also Fed. Trade Comm'n v. Sec. Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991) (rejecting individualized proof of detriment and stating "[i]t would be virtually impossible for the FTC to offer such proof, and to require it would thwart and frustrate the public purposes of FTC action. This is . . . a government action brought to deter unfair and deceptive trade practices and obtain restitution on behalf of a large class . . . . It would be inconsistent with the statutory purpose for the court to require proof of subjective reliance by each individual consumer."); *Fed. Trade Comm'n v. Kitco of Nev., Inc.*, 612 F. Supp. 1282, 1293 (D. Minn. 1985) ("Requiring proof of subjective reliance by each individual consumer would thwart effective prosecution of large consumer redress actions and frustrate the statutory goals of the [FTC Act]."). We may presume detriment from the evidence that Defendants' corporate

practices took unfair advantage of borrowers' disadvantages to a gross degree. *See Fed. Trade Comm'n v. Nat'l Bus. Consultants, Inc.*, 781 F. Supp. 1136, 1141 (E.D. La. 1991) ("[T]he FTC does not need to prove individual reliance on defendants' material representations and omissions; rather, the proper standard to establish reliance in an FTC action, as here, is based on a pattern or practice of deceptive behavior."). Thus, there was sufficient evidence of detriment to the borrowers, and substantial evidence supported the district court's ruling that Defendants violated Section 57-12-2(E)(1).

**{27}** For the same reasons, there was also substantial evidence supporting the finding of procedural unconscionability as understood in common law. Procedural unconscionability may be found where there was inequality in the contract formation. *Cordova*, 2009-NMSC-021, ¶ 23. Analyzing procedural unconscionability requires the court to look beyond the four corners of the contract and examine factors "including the relative bargaining strength, sophistication of the parties, and the extent to which either party felt free to accept or decline terms demanded by the other." *Id.* As discussed at length above, the relative bargaining strength and sophistication of the parties is unequal. Moreover, borrowers are presented with Hobson's choice: either accept the quadruple-digit interest rates, or walk away from the loan. The substantive terms are preprinted on a standard form, which is entirely nonnegotiable. The interest rates are set by drop-down menus in a computer program that precludes any modification of the offered rate. Employees are forbidden from manually overriding the computer to make fee adjustments without written permission from the companies' owners: manual overrides "will be considered in violation of company policy and could result with . . . criminal charges brought against the employee and or termination." Because these contracts are prepared entirely by Defendants, who have superior bargaining power, and are offered to the weaker party on a take-it-or-leave-it basis, Defendants' loans are contracts of adhesion. *See Fiser*, 2008-NMSC-046, ¶ 22 (discussing the factors that create an adhesive contract). "Adhesion contracts generally warrant heightened judicial scrutiny because the drafting party is in a superior bargaining position," *Rivera v. Am. Gen. Fin. Servs., Inc.*, 2011-NMSC-033, ¶ 44, 150 N.M. 398, 259 P.3d 803, and although they will not be found unconscionable in every case, "an adhesion contract is procedurally unconscionable and unenforceable when the terms are patently unfair to the weaker party." *Id.* (internal quotation marks and citation omitted). Under these circumstances, there is substantial evidence that Defendants' loans are procedurally unconscionable under common law.

**B.      The district court's permanent injunction is an appropriate remedy**

**{28}** The UPA grants the State the right to seek restitution, civil penalties, and injunctive relief for unfair trade practices. Section 57-12-8(B) (empowering the Attorney General to "petition the district court for temporary or permanent injunctive relief and restitution"); § 57-12-11 (allowing the Attorney General to recover a civil penalty of up to $5,000 per willful violation). The district court granted the State a permanent injunction. "An injunction is an equitable remedy." *Cafeteria Operators, L.P. v. Coronado-Santa Fe Assocs., L.P.*, 1998-NMCA-005, ¶ 19, 124 N.M. 440, 952 P.2d 435. "The application of equitable doctrines and the granting of equitable relief rests in the sound discretion of the district

10

court." *Moody v. Stribling*, 1999-NMCA-094, ¶ 30, 127 N.M. 630, 985 P.2d 1210. The grant or denial of equitable remedies is reviewed for abuse of discretion. *Nearburg v. Yates Petroleum Corp.*, 1997-NMCA-069, ¶ 9, 123 N.M. 526, 943 P.2d 560. "Such discretion is not a mental discretion to be exercised as one pleases, but is a legal discretion to be exercised in conformity with the law." *Cont'l Potash, Inc. v. Freeport-McMoran, Inc.*, 1993-NMSC-039, ¶ 26, 115 N.M. 690, 858 P.2d 66, *holding limited on other grounds by Davis v. Devon Energy Corp.*, 2009-NMSC-048, ¶¶ 34-35, 147 N.M. 157, 218 P.3d 75. "An abuse of discretion will be found when the trial court's decision is clearly untenable or contrary to logic and reason." *Id.* (internal quotation marks and citation omitted).

**{29}** The district court permanently prohibited Defendants from (1) targeting borrowers to try to increase the amount of their principal debt obligation until the borrower's file had become inactive for at least sixty days; (2) quoting the cost of signature loans "in terms of a daily or other nominal amount . . . or in any other amount than that which is mandated by the federal Truth in Lending Act," in advertising materials or during loan origination; (3) engaging in any practice that focuses the borrower's attention on the loan's installment payment obligation "without also clearly, conspicuously, and fully disclosing and explaining the cost of the loan if repaid over the course of the full repayment term"; and (4) representing that the loans will be in any way "easy" to repay. The district court also ordered Defendants to (1) provide all borrowers with a copy of the amortization schedule; (2) provide information regarding a substantive legal defense and contact information for the Attorney General's Office when communicating with a borrower in connection with debt collection; and (3) revise employee manuals to reflect these changes.

**{30}** Because there was substantial evidence supporting the district court's findings that Defendants' lending practices were procedurally unconscionable, the district court had the authority to grant this injunctive relief pursuant to Section 57-12-8(B). The injunction attempts to remedy Defendants' procedurally unconscionable practices and is narrowly tailored to address each practice. We see nothing improper about the injunction.

## C. The loans were substantively unconscionable under common law and the UPA

**{31}** The district court concluded that it was precluded from ruling on substantive unconscionability absent an express statutory prohibition of the interest rates at issue, and without considering the evidence on each individual loan issued by Defendants. We disagree with both conclusions.

**{32}** "Unconscionability is an equitable doctrine, rooted in public policy, which allows courts to render unenforceable an agreement that is unreasonably favorable to one party while precluding a meaningful choice of the other party." *Cordova*, 2009-NMSC-021, ¶ 21. Substantive unconscionability is found where the contract terms themselves are "illegal, contrary to public policy, or grossly unfair." *Id.* ¶ 22 (quoting *Fiser*, 2008-NMSC-046, ¶ 20). In determining whether a contract term is substantively unconscionable, courts examine "whether the contract terms are commercially reasonable and fair, the purpose and effect of

11

the terms, the one-sidedness of the terms, and other similar public policy concerns." *Id.* "Contract provisions that unreasonably benefit one party over another are substantively unconscionable." *Id.* ¶ 25. Thus, substantive unconscionability can be found by examining the contract terms on their face—a simple task when, as here, all substantive contract terms were nonnegotiable, and embedded in identical boilerplate language. *See id.* ¶ 22. The test for substantive unconscionability as outlined in *Cordova* simply asks whether the contract term "is grossly unreasonable and against our public policy under the circumstances." *Id.* ¶ 31. We hold it is grossly unreasonable and against public policy to offer installment loans at 1,147.14 to 1,500 percent interest for the following reasons.

**{33}** Courts are not prohibited from deciding whether a contract is grossly unreasonable or against public policy simply because there is not a statute that specifically limits contract terms. In a landmark case on substantive unconscionability, *Williams v. Walker-Thomas Furniture Co.*, the District of Columbia Circuit Court reversed the District of Columbia Court of Appeals on precisely this issue. 350 F.2d 445, 448 (D.C. Cir. 1965). In that case, the court of appeals had determined that, although it "[could not] condemn too strongly appellee's conduct" in selling a woman a $514 stereo set "with full knowledge that appellant had to feed, clothe and support both herself and seven children" on a $218 monthly income, it would not find the contract unconscionable because it found no caselaw or legislation that would support a declaration that the contract at issue was contrary to public policy. *Id.* The circuit court reversed, stating "[w]e do not agree that the court lacked the power to refuse enforcement [of] contracts found to be unconscionable." *Id.* Even in the absence of binding precedent or statutory power, the circuit court held that "the notion that an unconscionable bargain should not be given full enforcement is by no means novel." *Id.* We agree with the reasoning of *Williams*. Ruling on substantive unconscionability is an inherent equitable power of the court, and does not require prior legislative action. "Equity supplements the common law; its rules do not contradict the common law; rather, they aim at securing substantial justice when the strict rule of common law might work hardship." Larry A. DiMatteo, *The History of Natural Law Theory: Transforming Embedded Influences into a Fuller Understanding of Modern Contract Law*, 60 U. Pitt. L. Rev. 839, 890 (1999) (internal quotation marks and citation omitted). Although there is not a specific statute specifying a limit on acceptable interest rates for the types of signature loans in this case, in addition to our caselaw addressing unconscionability, the Legislature has empowered courts to adjudicate cases involving claims of unconscionable trade practices under the UPA.

**{34}** In determining the public policy behind the UPA, we must first examine the statute's plain language. The statute expressly prohibits extensions of credit that take advantage of borrowers' weaknesses "to a grossly unfair degree" or that result in "a gross disparity" between the value and the price. Section 57-12-2(E). The UPA is a law that prohibits the economic exploitation of others. The language of the UPA evinces a legislative recognition that, under certain conditions, the market is truly not free, leaving it for courts to determine when the market is not free, and empowering courts to stop and preclude those who prey on the desperation of others from being rewarded with windfall profits.

**{35}** The district court determined that the signature loans do not result in a gross disparity between the value and the price because borrowers could pay off the loans early, and they "obtained a value beyond the face value, or even the time value, of the money borrowed—the ability to buy groceries for [their] children now, the ability to buy gas to get to a new job, [and] the ability to pay off a cell phone." In adopting this view, the district court was following a subjective theory of value, under which the more desperate a person is for money, the more "value" that person receives from a loan. Thus, hypothetically a high-cost loan could violate the statute if a person borrows money for betting on blackjack, because the "value" that person receives would be low compared to the price of the loan, whereas the same high-cost loan sold to a single mother who needs to feed her children could not violate the statute, because the "value" that mother receives would be high compared to the price of the loan. Under that erroneous reading of the statute, consumer exploitation would be legal in direct proportion to the extent of the consumer's desperation: the poorer the person, the more acceptable the exploitation. Such a result cannot be consonant with the consumer-protective legislative intent behind the UPA. It is not the use to which the loan is put that makes its value low or high, but the terms of the loan itself.

**{36}** Under an objective, not a subjective, reading of the UPA, Defendants' signature loans are low-value products. First, these loans are extremely expensive. The least expensive signature loan carries a 1,147.14 APR, meaning a loan of $100 carries a finance charge of $999.71. Second, Defendants do not report positive repayments to credit reporting agencies. Thus, borrowers who succeed in bearing the exorbitant costs associated with these loans and who make good-faith efforts to repay them can never improve their credit scores. Borrowers who fail to pay, however, can have their credit scores negatively impacted. They can be sued and have their wages garnished. They will also be liable for Defendants' costs of collecting on the debt, including attorney fees. Third, there is a $25 bounced check or automatic clearinghouse fee that can be added to the cost of the loan each time a check is returned for insufficient funds, and there is a 5 percent penalty fee for each late payment, each of which potentially increase the cost of these loans. Fourth, there is an acceleration-upon-default clause which provides that if a borrower falls behind on his or her payments over the year, then the full amount of the debt—principal and interest–comes due immediately. All of these loan features, in combination with the quadruple-digit interest rates, make it a low-value product regardless of how the borrower uses the principal. Defendants point out that people who take out mortgages will, like borrowers here, pay several times the principal in interest payments over the life of their loan. However, unlike a mortgage loan, borrowers are not gaining an asset when taking out a signature loan; rather, they are taking on liability. The value the borrower receives from a signature loan consists of a small amount of principal—never more than $300—and an enormous amount of risk. Therefore, these loans are objectively low-value products and are grossly disproportionate to their price.

**{37}** Defendants further contend it is not the public policy of this state to prohibit usurious interest rates because the Legislature removed the interest rate cap in 1981. In this argument lies the implicit assertion that by removing the interest rate cap, the Legislature was stating that there is *no* interest rate that would violate public policy. Indeed, Defendants' expert

13

testified that interest rates of 11,000 percent or even 11,000,000 percent would be acceptable under our statutory scheme.[4] If we were to accept Defendants' argument, we would have to hold that the doctrine of unconscionability as it exists at common law and in the UPA does not apply to the extension of credit. We decline to do so because to do so would thwart New Mexico public policy as expressed in the UPA and other legislation.

**{38}** Public policy is not set by a single statute, or the repeal of a single statute. Instead, we look to "other statutes *in pari materia* under the presumption that the legislature acted with full knowledge of relevant statutory and common law . . . [and] did not intend to enact a law inconsistent with existing law." *State ex rel. Quintana v. Schnedar*, 1993-NMSC-033, ¶ 4, 115 N.M. 573, 855 P.2d 562. We also look to the common law and to equity in determining public policy.

**{39}** Other relevant statutes include the Small Loan Act, Sections 58-15-31 to -39, which regulates the small loan industry; the unconscionability clause of the Uniform Commercial Code (UCC), Section 55-2-302; and the Money, Interest and Usury Act (Money Act), NMSA 1978, Sections 56-8-1 to -21 (1851, as amended through 2004), which sets a default interest rate of 15 percent for contracts where no interest rate is stated. Section 56-8-3. Because these statutes were enacted prior to the UPA, we can infer that the Legislature enacted the UPA with full knowledge of and in harmony with the public policy expressed by those statutes. *See Schnedar*, 1993-NMSC-033, ¶ 4 (holding that similar statutes "should be harmonized and construed together when possible, in a way that facilitates their operation and the achievement of their goals." (internal citation omitted)).

**{40}** The Legislature enacted the Small Loan Act in 1955 to, among other factors, "insure more rigid public regulation and supervision of those engaging in the business of making small loans, and . . . to facilitate the elimination of abuse of borrowers." Section 58-15-1(D). The Legislature was concerned with the exploitation of borrowers, declaring "experience has proven . . . that without regulations, borrowers of small sums are often exploited by charges generally exorbitant in relation to those necessary to conduct a small loan business." Section 58-15-1(C). This statutory language about exploitation and abuse evinces a consumer-protective public policy goal. At the time the Small Loan Act was enacted, New Mexico had an interest rate cap of 12 percent for unsecured debts such as small installment loans, which Defendants now offer at between 1,147.14 and 1,500 percent interest. NMSA 1978, § 56-8-11 (1957), *repealed by* 1981 N.M. Laws, ch. 263, § 4 (July 1, 1981).

**{41}** The UCC also addresses substantive unconscionability. The New Mexico Legislature

---

[4]In an example of the unlimited nature of this argument, Defendants' expert, Professor Thomas Lehman, also posited that it would be acceptable for a borrower to agree to harvest a kidney in exchange for $100. However, he stopped short of endorsing freedom to contract for one's own involuntary servitude, stating that although one could enter such a contract, one could "break that bond at any time they want."

14

adopted the UCC's unconscionability doctrine in 1961, which codifies the courts' broad remedial power to refuse to enforce an unconscionable contract, strike the offending clause, or limit the application of the offending clause to avoid an unconscionable result. Section 55-2-302. The official comment to Section 55-2-302 directly discusses legislative intent: "This section is intended to make it possible for the courts to police explicitly against the contracts or clauses which they find to be unconscionable." *Id.* cmt. 1. It goes on to state:

> *This section is intended to allow the court to pass directly on the unconscionability of the contract* or particular clause therein and to make a conclusion of law as to its unconscionability. The basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract. . . . *The principle is one of the prevention of oppression* and unfair surprise.

*Id.* (emphasis added). Although Section 55-2-302 pertains to the sale of goods, it was enacted prior to the UPA sections dealing with unconscionability.[5] Therefore, we can infer that when it enacted the unconscionability clause of the UPA, the Legislature intended to allow the courts the same flexibility in determining whether a contract extending credit is unconscionable.

**{42}** The Money Act also evinces a legislative intent to establish a consumer-protective public policy. Although the Legislature abolished the interest rate cap in 1981, Defendants' argument that in so doing the Legislature intended to permit any interest rate is without merit. The Money Act sets the default interest rate at 15 percent for contracts that do not specify an interest rate. *See* § 56-8-3 ("The rate of interest, in the absence of a written contract fixing a different rate, shall be not more than fifteen percent . . . ."). Thus, when the Legislature repealed the absolute cap of 12 percent interest for unsecured debts but left the default rate in place, it contemplated that a reasonable interest rate would be 15 percent. The Money Act sets the default interest rate for court judgments at 8.75 percent, unless the judgment is based on tortious conduct or bad faith, for which the default interest rate is 15 percent. Section 56-8-4(A)(2). Fifteen percent interest was the high end of the Legislature's contemplation. Additionally, the Money Act still prohibits excessive charges. Section 56-8-9(A) ("[N]o person, corporation or association, directly or indirectly, shall take, reserve, receive or charge any interest . . . or other advantage for the loan of money or credit . . . except at the rates permitted in Sections 56-8-1 through 56-98-21 NMSA 1978."). Lenders who violate the Money Act are required to disgorge all profits from the usury, not offset by

---

[5]The UCC provision on unconscionability, Section 55-2-302, was enacted by 1961 New Mexico Laws, Chapter 96, Section 2-302, six years prior to the enactment of UPA Sections 57-12-2 (defining unconscionable trade practices) and 57-12-3 (prohibiting unconscionable trade practices).

their operating costs. *See* § 56-8-13 (imposing a penalty of forfeiture of the entire amount of interest for "[t]he taking, receiving, reserving or charging of a rate of interest greater than allowed by this act").

**{43}** In 2007, the Legislature amended the Small Loan Act to try to address the payday loan crisis in New Mexico. *See* §§ 58-15-31 to -39; *see also* Martin, *supra*, 52 Ariz. L. Rev. at 577-87 (discussing the legislative history of payday loan regulation in New Mexico). The amendments cap the effective interest rate on payday loans at about 400 percent by limiting fees and interest on payday loans to $15.50 per $100 borrowed, plus an additional $0.50 per loan for fees charged by the consumer-information database provider. Section 58-15-33(B), (C). Payday lenders are required to take into account the borrower's financial position, and they cannot extend loans exceeding 25 percent of the borrower's gross monthly income. Section 58-15-32(A). However, the effective fee cap and other consumer protections built into the Small Loan Act only apply to payday loans, defined as loans with a duration of fourteen to thirty-five days, for which the consumer receives the loan principal and in exchange gives the lender a personal check or debit authorization for the amount of the loan plus interest and fees. Section 58-15-2(H).

**{44}** Defendants could not lawfully charge 1,147.14 APR on a year-long loan under the payday loan provisions of the Small Loan Act. Defendants were payday lenders until 2006, the year before the New Mexico Legislature enacted these statutory limitations on payday lending. Defendants admit that they substituted signature loans for payday loans in Illinois when the Illinois legislature began to regulate payday lending. In addition, Defendants admit that their signature loans could be considered substitute products for payday loans in New Mexico. The reasonable inference is that Defendants' signature loan products were specifically designed to make an end run around the consumer protections of the Small Loan Act, which the Legislature tried to prevent by stating that "licensee[s] shall not . . . use a device or agreement that would have the effect of charging or collecting more fees, charges or interest than that allowed by law by entering into a different type of transaction with the consumer that has that effect." Section 58-15-34(D). Their success in evading application of the Small Loan Act does not immunize Defendants from other laws that prohibit unconscionable loan practices.

**{45}** The Legislature did not repeal all statutes protecting consumers from usurious practices: far from it, the Legislature empowered the Attorney General and private citizens to fight unconscionable practices through the UPA; it ratified the court's inherent equitable power to invalidate a contract on unconscionability grounds under the UCC; it maintained a prohibition on excessive charges and set a reasonable default interest rate of 15 percent under the Money Act; and it set a de facto interest rate cap on substantively identical types of loans with the 2007 amendments to the Small Loan Act. Contrary to Defendants' contention that the repeal of the interest rate cap demonstrates a public policy in favor of unlimited interest rates, the statutes when viewed as a whole demonstrate a public policy that is consumer-protective and anti-usurious as it always has been. A contrary public policy that permitted excessive charges, usurious interest rates, or exploitation of naive borrowers

16

would be inequitable, particularly in New Mexico where a greater percentage of people are struggling in poverty, and where more households are unbanked and underbanked than almost anywhere in the nation.[6] Professor Peterson testified that "Defendants' signature loan product is among the most expensive loan products offered in the recorded history of human civilization." For comparison, interest rates that were considered high in the mid-twentieth century—rates used for high-risk borrowers on unsecured loans—were between 18 and 42 percent. Mafia loan sharks in New York City at the height of mafia power charged 250 percent interest. It is contrary to our public policy, and therefore unconscionable as a matter of law, for these historically anomalous interest rates to be charged in our state. We next address the appropriate remedy or remedies for the substantively unconscionable loans.

**D.      Restitution is the appropriate remedy for the procedural and substantive unconscionability of the signature loans in this case**

**{46}**    During the remedies phase of trial, the State requested that the district court invalidate all of the loans as the fruit of unconscionable lending practices and return the parties to their precontract status. Thus, the State sought restitution in the form of a full refund for borrowers of all money paid in excess of the principal on their loans. The district court denied restitution by any measure, reasoning that: (1) complete avoidance of the loans was improper because it would result in borrowers paying no interest; (2) the State's proposed remedy ignored the subjective value borrowers received, and would be a windfall to borrowers; (3) any refunds to borrowers would have to be offset by the subjective value they received; and (4) full refund restitution would be inequitable because it would put Defendants out of business. The final question is whether the district court abused its discretion in failing to grant restitution.

**{47}**    An abuse of discretion occurs "when the trial court's decision is clearly untenable or contrary to logic and reason." *Cont'l Potash*, 1993-NMSC-039, ¶ 26 (internal quotation marks and citation omitted). In this case, the district court was correct in determining that Defendants violated Section 57-12-2(E)(1), and the loans were procedurally unconscionable.

---

[6]Nineteen and a half percent of New Mexicans live below the poverty level, compared to 14.9 percent of people nationwide. *See* United States Census Bureau, State and County QuickFacts, New Mexico, Persons below poverty level, percent, 2008-2012, http://quickfacts.census.gov/qfd/states/35000.html. Thirty-five percent of New Mexico households are unbanked or underbanked, compared to 28.3 percent of households nationwide. Federal Deposit Insurance Corporation, 2011 FDIC National Survey of Unbanked and Underbanked Households, Appendices A-G, Table C-1, 2011 Household Banking Status by State at 126, www.fdic.gov/householdsurvey/. More New Mexico households are unbanked and underbanked than anywhere in the Northeast, Midwest, or West. *Id.* Only six states have a higher or the same percentage of underbanked households: Alabama, Arkansas, Georgia, Louisiana, Mississippi, and Texas. *Id.* Only three states have a higher percentage of unbanked households: Arkansas, Mississippi, and Texas. *Id.*

On that basis alone, the district court could have voided the contracts entirely. Loans need not be both procedurally and substantively unconscionable to be invalidated by a court. *Cordova*, 2009-NMSC-021, ¶ 24 ("[T]here is no absolute requirement in our law that both [substantive and procedural unconscionability] must be present to the same degree or that they both be present at all" in order to invalidate a contract.). Thus, where, as in this case, there is overwhelming evidence that the loans were procedurally unconscionable, no evidence of substantive unconscionability is needed in order to invalidate the contract. However, in this case, we hold that the interest rate terms were substantively unconscionable. Given the fact that these loans were both substantively and procedurally unconscionable, it would not have been an abuse of discretion to invalidate the entirety of the contracts. *See, e.g.*, *Rivera*, 2011-NMSC-033, ¶ 56 (invalidating the entire arbitration scheme on substantive unconscionability grounds); *Cordova*, 2009-NMSC-021, ¶ 40 (same).

**{48}** Moreover, "[i]n the UPA, the Legislature has provided for damages and other remedial relief for persons damaged by unfair, deceptive, and unconscionable trade practices. Since the UPA constitutes remedial legislation, we interpret the provisions of this Act liberally to facilitate and accomplish its purposes and intent." *Quynh Truong v. Allstate Ins. Co.*, 2010-NMSC-009, ¶ 30, 147 N.M. 583, 227 P.3d 73 (internal quotation marks and citations omitted). It is the task of the courts to "ensure that the Unfair Practices Act lends the protection of its broad application to innocent consumers." *Ashlock v. Sunwest Bank of Roswell, N.A.*, 1988-NMSC-026, ¶ 7, 107 N.M. 100, 753 P.2d 346, *overruled on other grounds by Gonzales v. Surgidev Corp.*, 1995-NMSC-036, ¶ 16, 120 N.M. 133, 899 P.2d 576. In order to facilitate the consumer-protective legislative purpose of the UPA, there was ample reason to grant restitution to borrowers for Defendants' unconscionable trade practices. It would not further the purpose of the UPA under these circumstances to allow Defendants to retain the full profits of their unconscionable trade practices. Thus, the district court abused its discretion in failing to grant any form of restitution. Nevertheless, we agree with the district court that it would be inequitable to allow borrowers to pay no interest at all.

**{49}** When a contract term is unconscionable, like the 1,147.14 to 1,500 percent interest rates in this case, the court "may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result." *Padilla v. State Farm Mut. Auto. Ins. Co.*, 2003-NMSC-011, ¶ 15, 133 N.M. 661, 68 P.3d 901 (internal quotation marks and citations omitted). We decline to grant a windfall to all borrowers by allowing them to completely avoid the contracts. We hold instead that the quadruple-digit interest rate, a substantively unconscionable term, shall be stricken from the contracts of all borrowers. We then enforce the remainder of the contract without the unconscionable term. *Id.*

**{50}** The district court avoided calculating restitution, calling the task "arbitrary and unjustified" without precise figures to draw upon. However, the New Mexico statutes provide a default interest rate that allows "private lenders to charge interest on money debts at the legal rate where the contract is silent on the issue." *Martinez v. Albuquerque*

18

*Collection Servs., Inc.*, 867 F. Supp. 1495, 1508 (D.N.M. 1994) (citing 47 C.J.S. *Interest & Usury* § 11 (2014) "(promise to pay interest at the legal rate implied at law)"). Fifteen percent is the maximum allowable default interest rate. Section 56-8-3(A) ("The rate of interest, in the absence of a written contract fixing a different rate, shall be not more than fifteen percent annually . . . on money due by contract."); *Sunwest Bank of Albuquerque, N.A. v. Colucci*, 1994-NMSC-027, ¶ 24, 117 N.M. 373, 872 P.2d 346 (holding that Section 56-8-3 "fixes the *maximum* rate" that can be awarded by the district court). The default rate under Section 56-8-3 is calculated as simple interest. *See Consol. Oil & Gas, Inc., v. S. Union Co.*, 1987-NMSC-055, ¶ 42, 106 N.M. 719, 749 P.2d 1098 (holding that Section 56-8-3 must be calculated as simple interest); *c.f. Peters Corp. v. N.M. Banquest Investors Corp.*, 2008-NMSC-039, ¶¶ 51-52, 144 N.M. 434, 188 P.3d 1185 (distinguishing Section 56-8-3 from another statutory section whose express language allows for compound interest). Because the unconscionable interest rates in Defendants' loans are invalid terms, these contracts are silent with respect to rates. We apply the statutory default interest rate of 15 percent simple annual interest to these loans.

**{51}** Defendants must refund all money collected by Defendants on their signature loans in excess of 15 percent of the loan principal as restitution for their unconscionable trade practices. We recognize that the district court could have fashioned a remedy whereby the borrowers would pay less for these loans by either setting a default interest rate lower than the statutory maximum of 15 percent, or by imposing an amortization schedule on the loans under which the total finance charge on the 15 percent simple interest loans would amount to less than 15 percent of the whole principal. We decline to do so here for the sake of equity and to prevent delay. Instead, Defendants will keep the maximum allowable interest of 15 percent under Section 56-8-3 and refund the remainder of the monies that the borrowers paid on their loans that is over 15 percent of the principal. For example, Oscar Wellito's $100 loan with 1,147.14 APR is now rewritten as a $100 loan with 15 APR. With simple interest, he therefore owes $115 on the contract. He paid Defendants a total of $160.64. Defendants must refund $45.64 to Mr. Wellito, which is the difference between the monies he paid on their unconscionable contract, $160.64, and the monies he owes under the reformed contract, $115. Because these contracts are unconscionable, Defendants must also refund any penalties or fees they collected from borrowers that were associated with missed, late, or partial payments.

## IV.    CONCLUSION

**{52}** We hold that loans bearing interest rates of 1,147.14 to 1,500 percent contravene the public policy of the State of New Mexico, and the interest rate term in Defendants' signature loans is substantively unconscionable and invalid. We therefore reverse the district court's ruling on substantive unconscionability. We affirm the district court's ruling that Defendants engaged in procedurally unconscionable trade practices, and uphold the permanent injunction granted against Defendants. Accordingly, we affirm in part, reverse in part, and remand to the district court for a determination of damages in accordance with this opinion.

19

**{53}  IT IS SO ORDERED.**

_____
**EDWARD L. CHÁVEZ, Justice**

 **WE CONCUR:**

_____
**BARBARA J. VIGIL, Chief Justice**

_____
**PETRA JIMENEZ MAES, Senior Justice**

_____
**RICHARD C. BOSSON, Justice**

_____
**CHARLES W. DANIELS, Justice**